## EQUITABLE LIFE INS. CO. OF IOWA v. HALSEY, STUART & CO.

### No. 7032.

Circuit Court of Appeals, Seventh Circuit.
April 27, 1940.

Rehearing Denied June 19, 1940.

Norman H. Pritchard, Irving Herriott, and W. Ward Smith, all of Chicago, Ill. (J. G. Gamble and A. B. Howland, both of Des Moines, Iowa, of counsel), for plaintiff-appellee.

Edward R. Johnston and Samuel W. Block, both of Chicago, Ill., for defendant-appellant.

Before EVANS, SPARKS, and TREANOR, Circuit Judges.

SPARKS, Circuit Judge.

This is an appeal from a judgment for $66,150 entered in an action in deceit to recover damages for alleged misrepresentations and concealments of fact. These were alleged to have induced appellee to purchase over $300,000 of bonds which subsequently resulted in an alleged loss of $250,157 to appellee. Appellant alleges error as to various rulings on evidence, instructions to the jury, and failure to grant its motions for a directed verdict and for a new trial.

The bonds in question were issued during the years 1925 to 1927 by a number of local improvement districts of the city of Longview, Washington. The districts were organized in accordance with the statutory provisons of that State which permitted the issue of such bonds, payable out of taxes collected on special assessments levied by the districts against the lands within each district benefited by the improvement. The city itself was built by the Long-Bell Lumber Company on part of an 11,000 acre tract which it bought in 1922 at the junction of the Columbia and Cowlitz rivers. This tract had formerly been used for farming and grazing.

The Long-Bell Lumber Company, hereafter referred to as Long Bell, was a Missouri corporation which, prior to the period involved in this litigation, had carried on its business operations for the most part in the South. In 1919 and 1921, it had purchased extensive timber acreage in the Northwest, in Oregon and Washington. In order to provide for the large number of employees it expected to use in connection with its milling and manufacturing operations, it determined to build the new city near the rivers. The site chosen was subject to periodic overflows from the rivers, hence it was necessary to build a system of dikes, which work was done by Long Bell or its subsidiaries. The cost of the work was then funded through the organization of a diking district in accordance with the provisions of the Washington statute. The district issued its bonds and delivered them to Long Bell to pay for the work. Long Bell then proceeded, through one or more subsidiaries, to lay out the city of Longview, which was to be a model city with large parks and civic centers. Several public buildings were donated by R. A. Long, President of Long Bell. The city was planned on a scale large enough to accommodate a population of many more than the 15,000 or 20,000 expected to result from its own operations. An elaborate zoning system was laid out on a scale to provide for development in proportion to the contemplated increase of population. Extensive improvements were constructed such as paving, sidewalks, curbs and sewers. All the work was done by Long Bell and later taken over by the local improvement districts of which there were twenty-two. Only two of these, #11 and #19, covered the entire city, and all the others were for smaller units.

Beginning as early as 1922, and perhaps some time earlier, appellant, Halsey, Stuart and Company, had been closely associated with Long Bell. It had underwritten first mortgage bonds of that company totalling $20,000,000, acting, according to a statement contained in a prospectus pertaining thereto, as fiscal agent for it. It had also underwritten an issue of $3,250,000 of bonds of a railroad owned by a subsidiary of Long Bell and guaranteed by Long Bell, as well as the $3,225,000 issue of diking district bonds. When the local improvement district bonds were issued, each series was sold by Long Bell to Halsey, Stuart, for sale to the latter's customers. Halsey, Stuart knew that all of these bonds bore the guaranty of Long Bell. Halsey, Stuart not only distributed all the aforementioned obligations in the first place, but it also furnished practically the only market for them, buying them in for resale to its customers. A letter from one of its officers to Long Bell commented on the fact that, "In the last analysis we are the market on Long-Bell securities except possibly very small amounts * * *." This letter related to a controversy over compensation claimed to be due Halsey, Stuart for handling a volume of about $55,000,000 of bonds of Long Bell, and indicated that appellant expected to be reimbursed by the latter for its expenses in handling the securities.

Early in May, 1930, B. C. Kelley, local representative of appellant in Des Moines, Iowa, approached appellee with a view to selling it some of the improvement district bonds. Appellee, a life insurance company incorporated in Iowa, had previously made purchases of over $1,000,000 in securities from appellant for its investment portfolio. Under the provisions of the Iowa statutes, insurance companies were permitted to invest their policy reserves in municipal securities, but not in obligations of private corporations. In 1927, Frank Wood, appellant's sales manager in charge of the Iowa-Nebraska-Colorado territory, had participated in the compilation of statistics preparatory to the drafting of an amendment to the Iowa statute relating to the investment of policy reserves, hence was familiar with the fact of its restrictions. Appellant also knew that appellee was interested in purchasing securities only for investment, and not for speculation or resale.

When Kelley proposed the purchase by appellee of the bonds in question, he delivered to F. W. Hubbell, a vice-president of appellee and in charge of its investment program, a number of documents pertaining to the issue. These consisted of an offering circular dated April 7, 1927, for a bond issue of $785,734; a tabulation of the number of assessment districts in Longview with the amount of bonds issued and redeemed by each, and the amount outstanding; copies of several full page advertisements of the city of Longview which had appeared originally in the Saturday Evening Post; some pamphlets issued by the Chamber of Commerce containing glowing descriptions of the city; and a balance sheet of Long Bell dated January 1, 1927.

The first item furnished, the Halsey, Stuart prospectus, was based on information submitted by Long Bell. It contained a description of the city of Longview, as being situated at the confluence of the Columbia and Cowlitz rivers, having a frontage of 7¼ miles along the former, and being a port of call for ocean-going vessels between Portland and the Pacific Ocean, with facilities for the largest cargo ships. It was also stated that: "Because of its natural advantages and proximity to the timber stands of the Long-Bell and Weyerhaeuser interests, Longview was selected as the site for the vast lumber manufacturing plants of these companies * * *. Manufacturing plants have also been erected by other concerns, including the Longview Concrete Pipe Co., the Pacific Straw, Paper and Board Co., and Magor Car Corp., the Standard Oil Co., Longview Paint and Varnish Co. and the Central Mill Works. The first unit of the plants of the Longview Fibre Co., to cost 2½ million dollars, is now well under way. Longview, with a population of 12,000, has now more than 36 miles of concrete paved streets, 115 miles of graded and gravelled streets, 71 miles of concrete sidewalks, 56 miles of water mains, and 48 miles of storm and sanitary sewers. The city has been laid out along model lines, and has excellent schools, a motorized fire department, a thoroughly modern hospital, library, community, Y. M. C. A. and other public buildings. Two banks report combined deposits of $1,-500,000 and over 4,500 depositors."

This prospectus contained the following clause: "All statements herein are official or are based on information which we regard as reliable, and while we do not guarantee them, we ourselves have relied upon them in the purchase of this security." The prospectus also contained the statements: "Exempt from Federal Income Taxes. Eligible as investments of mutual savings bank and insurance companies organized in the State of Washington," and "The payment of principal and interest on these bonds is unconditionally guaranteed by endorsement by the Long-Bell Lumber Company."

Another description, to which Hubbell said he gave considerable attention, from a Saturday Evening Post advertisement, stated: "The thoroughly modern, electrically operated manufacturing plants shown in the above sketch are in Longview, Wn. They produce 1,800,000 feet of Doug-las Fir lumber a day. The buildings cover 72 acres. Six ocean-going freighters can load at one time at the Long-Bell docks. The equipment of the plants includes every modern device for producing good lumber economically."

From these various descriptions, Hubbell testified that he was led to and did believe that the plants described were all located within the city of Longview. He knew then that District #19 covered practically the entire city.

The tabulation showed that of a total of $3,149,726 of bonds issued by twenty districts beginning September, 1925, $1,136,726 had been called up to May, 1930. These included $253,699 of the $908,699 issued by District #11 in May, 1926, and $137,104 of the $464,104 issued by District #19 in January, 1927.

Hubbell and Kelley both testified that the former asked for information about Long Bell as well as the city. In furnishing the information, Kelley turned over the file from appellant's Chicago office, containing all the data relating to the various issues, and also a financial report of Long Bell as of January 1, 1930. This 1929 financial report included a letter to stockholders signed by the President of Long Bell, dated March 12, 1930, stating:

" * * * General conditions during the closing months following the break in the stock market very seriously affected the consumption of lumber, which was reflected in our business.

"The last two weeks have shown some increase in demand, but prices have not improved and indications are not very flattering for the immediate future. * * * What the last two quarters of the year will be depends largely upon crops and general business conditions."

Wood, in making the formal offer of the bonds, wrote in a letter of May 14, 1930:

" * * * We believe you have before you practically all the data covering this issue of bonds, but if you have any questions in mind, we shall be pleased indeed to have you call Mr. Kelley or this office for anything that you may need.

"You observe, of course, that this city has no funded debt, other than these Improvement Bonds, and that the original debt has been materially reduced through retirement and maturity."

Hubbell testified that Kelley furnished everything for which he asked in the way

of information either from appellant's office, from Longview, or from Long Bell. He made no independent investigation of the city, being two thousand miles away from it, but relying upon the data furnished by appellant's agents, recommended to appellee the purchase of the bonds which appellee bought as follows:

| | | | |
|---|---|---|---|
| May 20, 1930, | $ 85,000 par value, at | $ 84,787.50 | |
| May 29, 1930, | 15,000 par value, at | 14,962.50 | |
| Sept. 29, 1930, | 26,000 par value, at | 25,935 | |
| Oct. 10, 1930, | 9,000 par value, at | 8,977.50 | |
| Oct. 21, 1930, | 200,000 par value, at | 199,500 | |
| Oct. 30, 1930, | 2,000 par value, at | 1,995.50 | |

Practically all the bonds were bought at 99.75. They bore interest at the rate of 6% per annum. $279,000 of the bonds were in Districts #11 and #19, the two districts whose limits coincided with those of the city. At the time of the purchases the city had a population of between 10,000 and 15,-000 and there was contained within its corporate limits a great deal of vacant, unimproved, unplatted property. During the time appellee held the bonds it received $130,337 interest on them.

While it was stated in the various circulars and other advertising matter that a number of industrial plants were located in Longview, in fact all of those mentioned lay outside the limits of the city, hence their properties were not subject to assessment to pay off the bonds. A further misstatement contained in the advertising was the fact that the city had a frontage of 7¼ miles along the Columbia river. The fact was that in 1925, the corporate limits did not touch the Columbia river. (They were subsequently enlarged, in 1926, to include a strip of land down to the Public Dock Property.)

The officer of appellant who assembled the material for and prepared these circulars testified that he had no other information regarding the facts, having relied on information furnished by Long Bell since they had handled the bonds only on the basis of the Long Bell guaranty rather than on their security as municipal bonds—"Under the Washington laws governing the issuance of Local Improvement District Bonds, we knew from records available, generally, that the bonds issued under those laws, were having difficulty, and we would not have considered these at all * * * predicated simply upon that security." While they did inquire as to the valuation of the lands subject to assessment, they did not consider the low value of any significance,

again because they relied only on the Long Bell guaranty. In response to an inquiry from one of appellant's branch offices for information regarding each particular district, the officer quoted above, stated by telegram: "We haven't the data but with exception one or two districts showing would probably be disappointing from point of population area valuations etc. and for this reason we rely entirely on Long Bell guaranty."

Although Kelley knew of the reliance on this guaranty rather than on the properties assessable for payment of the bonds, there is nothing of record to indicate that this was disclosed to Hubbell. In fact, Kelley testified: "My impression is that Halsey, Stuart and Co. had bought these Longview * * * Bonds solely on the guaranty of the Long Bell Lumber Co., but I have no recollection of having told Mr. Hubbell that there was no justification for Halsey, Stuart and Co. being in this financing except for that guaranty."

Appellee contends that in addition to the actual misstatements of fact contained in matter used by appellant to promote the sales, other facts having a very material bearing on the security of the bonds were not revealed to appellee. It was not shown, for instance, that Long Bell, the guarantor of the bonds, owned over 70% of the lands within the corporate limits. Appellant's president did not deny knowing this fact. He said "I may have known (it)." This meant that in addition to being liable on the guaranty, Long Bell was also directly liable for the assessments on the lands which it owned, many of which were unplatted and unimproved and subject to very burdensome assessments for both diking district and local improvement bonds. However, the record is not clear that appellant knew this.

The foregoing misstatements had to do with the value of what might be called the direct security back of the bonds, the lands liable for assessment to pay the bonds. As to these facts, appellant disclaimed any liability, for the reason, as stated above, and stated by several witnesses, that it handled the bonds on the basis of the Long Bell guaranty without which it would not have handled them at all. As to the value of this guaranty, it was shown that in the year 1930, the lumber industry generally was in rather a precarious condition, and that commercial banks had all adopted the policy of closing out the accounts of lumber and tim-

ber companies. As early as January, 1930, plans were under consideration looking toward a strengthening of the industry generally by means of merger of various companies. Long Bell had paid no dividends on its Class A stock since September, 1927, and correspondence exchanged between it and appellant shows that early in 1930, at least one of the commercial banks which had previously extended lines of credit totalling $9,000,000 had refused to continue its credit and others were extremely critical. Early in May the Equitable of New York had suggested that special arrangements be made to put the banks in a more secure position. While appellant did not participate in the discussions regarding this matter, it appears that it was kept informed at all times, and that it learned of the plan under consideration some time between May 15 and June 30, 1930. It was also shown that Stuart wrote to Long in April, 1930, to the effect that Long Bell credit was selling in the market on such a basis as to make it difficult if not too costly to undertake the sale of notes secured by the pledge of participation certificates in a certain timber contract. Stuart also suggested, by letter of May 5, 1930, that Long Bell approach a certain New York firm for such financing, saying that they might be organized to make loans where the securities were not immediately marketable, but that they would probably demand a large commission or bonus.

During May of 1930, it became publicly known that Long Bell had sustained substantial operating losses from the beginning of the year. This was shown by evidence introduced by appellant consisting of photostatic copies of pages of The Chicago Journal of Commerce for May 20, 1930, and the Annalist for May 23, 1930, both of which carried the report of a loss on the part of Long Bell of $305,041 for the quarter ending March 31, 1930, as compared with a deficit of $27,702 for the same period in 1929. Appellee was a subscriber to both of these publications as well as others which carried the same information.

The discussions over the extension of the commercial banks' lines of credit culminated, in October, 1930, in the creation of a new corporation, the Long-Bell Lumber Sales Corporation, to which were transferred as of November 1, 1930, all the unencumbered assets of Long Bell. In exchange for these assets, the Sales Corpora-

tion delivered to Long Bell all of its capital stock. The arrangement was that for the future, all bank loans were to be made to the Sales Corporation to be secured by pledge of the transferred assets.

Appellee first learned in June, 1931, that all the facts regarding Longview and Long Bell were not as represented to it at the time of the purchase of the bonds, when it sent a representative to the west coast to investigate a number of securities owned by it. He then learned and reported to appellee that the manufacturing plants which had been stated to be in Longview were outside the city limits, and that the city did not have the frontage on the Columbia river. He also reported that the Longview Company, a subsidiary of Long Bell, owned from 60 to 75 per cent of the property within the city. Shortly after this trip, appellee learned of the assessments on the city lots to pay the diking district bonds.

In 1934, a voluntary petition for reorganization under 77B of the Bankruptcy Act, 11 U.S.C.A. § 207, was filed by Long Bell, resulting in the confirmation of a plan according to which Long Bell was relieved of the guaranty of the bonds held by appellee, and in exchange for such guaranty, appellee received common stock in the reorganized corporation. Foreclosure proceedings were instituted by the Treasurer of the county in which Longview was located, upon default in payment of general taxes for the year 1931, and these resulted in the sale of the lands charged with the liens of the improvement district bond assessments free of such liens. Appellee was then left with only the common stock of the reorganized Long Bell Company representing the greater part of its investment. While some of the bonds had been redeemed prior to the beginning of this action, appellee still held at that time, bonds of the par value of $308,000, on which it claimed a loss of $250,157. These bonds were carried on appellee's books at par value until after the suit was started. By the time of trial, more of these had been redeemed, leaving appellee then with $266,000 par value in return for which it received 8.4 shares of common stock of the reorganized corporation for each $1,000 bond. This stock was listed as of January 4, 1939, at 12 bid, 13 asked.

Of the $266,000 of bonds still held at the time of trial, $177,000 were in District #11;

$47,000 in District #19; and $42,000 in other districts not coterminous with the city.

Appellant attacks the judgment for $66,-150 on the ground that there was no competent evidence to prove that it willfully, maliciously, fraudulently and falsely made the representations alleged to have induced appellee to purchase the bonds; that it was under no duty to disclose to appellee all the facts within its knowledge concerning the bonds, the city, or Long Bell; that there was no competent evidence to prove the willful, false, and fraudulent concealment of material facts with respect to the city, the bonds, or Long Bell to induce the purchase of the bonds; that the court erred in instructing the jury on the issue of damages, and in permitting incompetent evidence on that issue, and that there was no competent evidence in the record to sustain the damages awarded by the jury; and that the court erred in its instructions.

 The essential elements required to sustain an action for fraud and deceit have been frequently stated by the courts: That a representation was made as a statement of fact, which was untrue and known to be untrue by the party making it, or else recklessly made; that it was made with intent to deceive and for the purpose of inducing the other party to act upon it; and that he did in fact rely on it and was induced thereby to act to his injury or damage. McGrath v. Dougherty, 224 Iowa 216, 275 N.W. 466; Hubbard v. Weare, 79 Iowa 678, 44 N.W. 915; Beach v. Beach, 160 Iowa 346, 141 N.W. 921, 46 L.R.A.,N.S., 98, Ann.Cas.1915D, 216; Gipp v. Lynch, Iowa, 285 N.W. 659; 23 Am.Jur. on Fraud and Deceit, § 20. Without the concurrence of all of these elements there can be no actionable fraud. None can be presumed, but each must be strictly proved, and the burden is on the plaintiff to establish the fraud by clear, convincing and satisfactory evidence. Eckhardt v. Bankers Trust Co., 223 Iowa 471, 273 N.W. 347. The question then is, did the facts here presented, when considered together, spell out all the elements necessary to maintain the action?

 Appellee contends that the evidence justified a finding by the jury that appellant made false and fraudulent representations with respect to:

The location of the industrial plants,

The frontage of the city on the Columbia river,

The existence and extent of securities outstanding at Longview "other than these Improvements Bonds," and

The financial condition of Long Bell and its subsidiaries.

As to the first two which we think constitute the only actual *misstatements* in the record, appellant expressly guarded itself against liability for possible inaccuracy by the hedge clause in the prospectus as set forth above. It is true that no such clause is shown as to these same statements contained in the various advertisements, pamphlets, and the like, which were turned over to appellee for its consideration in connection with the offer of the bonds. However, the statements differ in no material respects from those of the prospectus, and we see no reason why appellant should be held accountable for assertions obviously put out by others, when it had expressly disclaimed responsibility for those same statements in the literature put out by itself, and when there is no proof that appellant knew of the falsity of the statements. Although appellee sought to show that several of appellant's agents must have known of their falsity since they had visited Longview, there was no actual proof of such knowledge, and neither the jury nor this court would be justified in inferring it from the facts presented. Therefore the hedge clause constituted a valid defense to the charge of misrepresentation as to the location of the plants and the river frontage, and the jury should have been so instructed.

 The third item as to which appellee charges falsity relates to the diking bonds which constituted a prior lien upon the lands subject to assessment for payment of the improvement district bonds. While appellant made no reference to these bonds at all, appellee charges that the letter of Wood, "We believe you have before you all the data," and "You observe, of course, that this city has no funded debt, other than these Improvement Bonds," constituted a false statement that the city had no other debts than these bonds. In fact, the city had no funded debt whatever. This was certainly a careless statement for a representative of appellant to make, implying as it did that the bonds involved were part of the funded debt, and that there were no other obligations on the part of the city which were equal or superior to them. However, Hubbell admitted that he knew that the bonds did not constitute

a funded debt, and he also admitted that he had read a paragraph in the Long Bell balance sheet referring to the accrued assessments on Diking and Improvement District bonds guaranteed by Long Bell, and to the fact that the former were issued to take up warrants issued in payment for construction work, and that he knew that there was a consolidated diking district, but he had never thought to ask where the diking system was located. He also admitted that until after 1932 or 1933 he had never investigated the possibility of overlapping municipal districts. In view of all these facts, we are of the opinion that the materiality of the letter and its possible implications is trivial.

■ The misrepresentation with respect to the financial condition of Long Bell, if any, must be built up from the furnishing of a balance sheet as of December 31, 1929, without disclosure that it did not correctly reflect the actual financial condition of the company from May to October, 1930, the period in question and to which it was supposed to apply. It is not suggested that this statement was of itself false in any respect. Moreover, that report contained within its own four corners what might well have served as notice of financial difficulties of the company—we refer to a paragraph in the letter to stockholders dated March 12, 1930, which accompanied the balance sheet, stating that general conditions following the stock market break had seriously affected the consumption of lumber which was seriously reflected in Long Bell business, and that what the last two quarters of the year would be, depended upon crops and general business conditions. It is inferable that if appellant had been very anxious to conceal the condition of Long Bell it might well have removed this letter from the accompanying statement, calculated as it was to raise questions as to the then position of the company. However, it went to appellee along with all the other items for which Hubbell asked—he admitted that he had been furnished everything for which he asked, and Kelley's testimony that Hubbell asked specifically for the "annual report covering Long-Bell Lumber Company's operations for the year ended 1929," was uncontradicted.

Hubbell stated that he did not recall requesting any further information as to the purchases made subsequent to the first one in May, 1930. However, within a few days of that purchase, it became a matter of public knowledge that Long Bell had sustained a substantial operating loss for the first quarter of the year 1930. Had appellee made use of the financial news reports available in its own offices it would have learned of this fact long before the subsequent purchases were made. Not only did it not make any use of these sources of information, but it did not even inquire of appellant as to whether or not the situation had changed in any way. The only evidence of concealment was that further facts were not voluntarily disclosed. Under these circumstances we think the duty to disclose all its information subsequently did not devolve upon appellant. Appellee relies upon the case of Noble v. Renner, 177 Iowa 509, 159 N.W. 214. There the court held the vendor liable in fraud for failing to divulge facts which occurred between an investigation by the buyer of the real estate involved, and the actual purchase. The vendor sold a farm guaranteed to contain a certain acreage, when in fact a considerable portion of it had been cut away by the action of a river after the buyer inspected it, although the vendor had told him that there was no more such cutting. We consider this inapplicable to the facts here involved.

We think the facts as shown by the record fall short of those required to make out a case of fraudulent concealment. The cases which hold that failure to disclose material information constitutes fraudulent concealment sufficient to maintain an action for fraud generally are based on such facts as the existence of a fiduciary relationship between the parties, or the doing of some affirmative acts to prevent the other party from making adequate investigation to discover the true facts.

"Concealment becomes a fraud where it is effected by misleading and deceptive talk, acts, or conduct, where it is accompanied by misrepresentations, or where, in addition to a party's silence, there is any statement, word, or act on his part which tends affirmatively to a suppression of the truth, to a covering up or disguising of the truth, or to a withdrawal or distraction of a party's attention from the real facts; then the line is overstepped, and the concealment becomes a fraud. Such conduct is designated 'active concealment,' and it produces the same result in law as positive misrepresentation." 23 Am.Jur. on Fraud and Deceit, § 93.

Here we have no fiduciary relationship—the parties were obviously dealing at arm's length, hence there was no legal duty imposed upon appellant to disclose all it knew. The only misleading act upon which a duty to speak might be predicated is the Wood letter, "We believe you have before you all·the data." And yet even this was accompanied by ."but if you have any questions in mind, we shall be pleased indeed to have you call Mr. Kelley or this office for anything that you may need." We think this cannot be construed as a deliberate attempt to throw appellee off its guard or mislead it into failing to pursue its inquiries further.

▮ Appellee quotes from the Iowa case of Foreman v. Dugan, 205 Iowa 929, 218 N.W. 912, 914:

"It is undoubtedly a correct rule of law that one who is called upon to speak in regard to a subject-matter may be guilty of false representation by evasion, or by speaking half the truth or failing to speak fully and truthfully where a duty rests upon him to so speak. In other words, one may be guilty, under certain circumstances, of false representations in failing to .disclose facts within his knowledge. Silence on a subject may constitute, under certain circumstances, a false representation, quite as much as spoken words. * * * But on the other hand, in determining whether there are actionable false and fraudulent representations, consideration must be given to the situation of the parties, the matters with which they are dealing, and the subject-matter in hand."

This language appears to us to be peculiarly in point as related to the facts of the case at bar. It is to be noted first that the rule comes into play only when one is called upon to speak. But before one may invoke the rule he must prove the duty to speak, arising out, of the special circumstances relied upon. Here, considering all the evidence in the light most favorable to appellee, we think it falls short of proving the circumstances necessary to impose upon appellant the absolute duty of disclosing all the facts it knew of the financial condition of Long Bell.

▮ Appellant's failure to disclose to appellee the fact that it had handled the bonds only on the basis of the Long Bell guaranty and would not have dealt with them at all without that guaranty presents a more perplexing question. This, in effect, means that, whereas appellant approached appellee for the purpose of inducing the purchase of municipal bonds, knowing that the latter was authorized by the statute to handle only that type of security and not the obligations of a private corporation, and that it was purchasing only for investment, what it actually offered was a security which it had handled solely as a corporate one. But is such failure to disclose actionable? The bonds were, in fact, municipals, regardless of the basis on which appellant had handled them. It was stated on the prospectus that they were eligible for investment for Washington companies supposedly similar to appellee in organization and requirements—at least our attention is not called to any more rigid restriction imposed by the Iowa statute than by the Washington.

Moreover, in view of the very unusual circumstances surrounding the building of this city, we are of opinion that it would have been strange if appellant 'had placed great reliance upon the security of the benefited properties rather than on the guaranty. While the prospectus itself does not call attention to the fact, it cannot be said that there was in the other advertising data furnished appellee any attempt to conceal the fact that there was not even the nucleus of a city there prior to the purchase of the tract for the express purpose of locating a city thereon. The acreage had been used for farming and grazing up to that time, and out of this acreage the Long Bell subsidiary prepared to establish a city. All of the descriptive literature furnished to appellee points to the fact that it was a very grandiose scheme, the success of which depended upon a very rapid industrial development, and particularly that of the lumber industry, since that obviously was the basic industry of the area. Hence the necessity of the corporate guaranty which appellant demanded before handling the security. All the facts pointed toward this, and it seems to us that any really thoughtful consideration on the part of appellee would have suggested it, and would have suggested more pertinent questions such as the success of the development, the population in 1930, the valuation of the benefited properties and the amount˙ of unsold land. It appears that when appellee did become suspicious, and made inquiries concerning the city, it was able to find out the facts at once, and there is nothing to suggest why it could not have found them

with equal facility before it purchased the bonds. Appellant here calls attention to the fact that it furnished absolutely everything for which appellee asked, and the record amply bears this out.

Hubbell admitted on cross-examination that he knew that Long Bell having built the city originally still owned a large part of the land, and that it would be a natural conclusion that when they laid out the city and turned it from farm land into a city, it would originally start out as Long Bell or Long Bell subsidiary property. He also knew that when a certain circular was put out some years after the founding of the city it was still spread out over a considerable amount of territory and there appeared to be a great deal of vacant property in one subdivision in particular. The record does not indicate that appellant had any more knowledge than appellee that this vacant, unimproved land still belonging to Long Bell amounted to from 60 to 75 per cent of the total. Certainly there is nothing of record to indicate that appellant deliberately withheld information as to this from appellee. Unquestionably it detracted from the value of the security, for vacant, unimproved land is not as good a subject for assessment as is built-up land in use. But appellee should have realized as well as appellant that the value of the bonds as municipals was subject to question. This probably accounted for the high interest rate they bore in comparison with other municipal securities.

We conclude that there was a failure of evidence to prove the concurrence of all the essential elements of an action for fraud. We are not unmindful of the rule that in determining the sufficiency of the evidence to support the verdict of the jury, all conflicts must be resolved in favor of the jury's finding, and that the party in whose favor the verdict is returned is entitled to the benefits of all inferences which may be fairly drawn from the testimony. This is not to say that in an action for fraud the plaintiff is entitled to prove his case by drawing inference from inference, and substituting non-disclosure for deliberate misrepresentation where the facts show no duty to disclose. We have

studied the cases cited by appellee upholding actions for fraud, particularly those involving sales of corporate securities. All of them involve obvious and flagrant falsities under circumstances permitting of no doubt as to the makers' knowledge.[1] Most of the cases were cited by appellee to support its proposition that the jury may consider subsequent events in determining the amount of damages. However, we may also consider them in relation to the nature and degree of the proof required to sustain the charge of fraudulent misrepresentation which must arise before there is any question as to the amount of damages for the fraud. It is unnecessary for us to discuss the facts of any of these cases except to say that a comparison of their facts with those relied upon in the case at bar indicates that the proofs here relied upon are insufficient to sustain the action, and the case should not have been submitted to the jury.

The judgment is reversed and the cause remanded with directions to grant a new trial.

---

[1] See Hotaling v. Leach & Co., 126 Misc. 845, 214 N.Y.S. 452, affirmed, 247 N.Y. 84, 159 N.E. 870, 57 A.L.R. 1136; Downey v. Finucane, 205 N.Y. 251, 98 N.E. 391, 40 L.R.A.,N.S., 307; Addis v. Swofford, Mo.Sup., 180 S.W. 548; Hindman v. First National Bank, 6 Cir., 112 F. 931, 57 L.R.A. 108; Morrow v. Franklin, 289 Mo. 549, 233 S.W. 224; Paul v. Cameron, 127 Neb. 510, 256 N.W. 11; Baumchen v. Donahoe, 215 Iowa 512, 242 N.W. 533.