**UNITED STATES of America**
**v.**
**Umberto ANASTASIO, also known as Albert Anastasia, Appellant.**
**No. 11350.**

United States Court of Appeals Third Circuit.

Argued Dec. 20, 1954.

Decided Sept. 19, 1955.

Rehearing Denied Nov. 16, 1955.

Samuel Paige, New York City (James
N. Pappas, Newark, N. J., Paige &
Paige, Norma Z. Paige, New York City,
on the brief), for defendant-appellant.

Charles H. Hoens, Jr., Newark, N. J.
(Raymond Del Tufo, Jr., U. S. Atty.,
Newark, N. J., on the brief), for plain-
tiff-appellee.

Before GOODRICH and KALODNER,
Circuit Judges, and LORD, District
Judge.

KALODNER, Circuit Judge.

Defendant is a native of Italy. On
June 29, 1943 the Common Pleas Court
of Lebanon County, Pennsylvania entered
its order admitting him to citizenship
and issued a certificate of naturalization
to him. Almost ten years later, on
December 9, 1952, the United States in-
stituted proceedings under Section 338
(a) of the Nationality Act of 1940, 54
Stat. 1137, 1158, 8 U.S.C. § 738(a)* to set
aside the naturalization decree and cancel
the certificate of naturalization on the
ground that the latter had been illegally
procured and was based on a fraudulent
Certificate of Registry issued to defend-
ant in 1931. The District Court for the
District of New Jersey entered an order
cancelling the defendant's certificate and
revoking the order admitting him to
citizenship, 1954, 120 F.Supp. 435. The
defendant thereupon filed the instant ap-
peal.

To begin at the beginning.

On September 12, 1917, the defendant,
then a 15-year old "aspiring seaman" on
the S.S. Sardegna, of foreign registry,
arrived at the Port of New York and was
granted shore leave. He failed to return
to his ship and twelve days later was
listed as a deserting seaman. There-
after, he made his home in the United
States.

On April 4, 1931, defendant made ap-
plication for a Certificate of Registry
under the Act of March 2, 1929, 45 Stat.
1512. In his application, he stated in
part as follows: "I have never been ar-
rested, summoned into court as a defend-
ant, convicted, fined, imprisoned, or
placed on probation, or forfeited col-
lateral for an act involving a felony,
misdemeanor, or breach of any public
ordinance." On May 5, 1931, before an
Immigration Inspector, the defendant
testified under oath that he had never
been arrested nor subjected to criminal
or civil prosecution. On the basis of the
record as stated, a Certificate of Registry
was issued on June 19, 1931. Evidence

* Now Immigration and Nationality Act of 1952, 8 U.S.C.A. § 1451(a).

in the present record discloses that defendant had in fact been arrested five times prior to his filing the "Application for Registry."

Subsequently, on October 30, 1931, the defendant filed a formal Declaration of Intention ("first papers") in the United States District Court for the Eastern District of New York; on November 16, 1933 he filed "Application for a Certificate of Arrival and Preliminary Form of Petition for Citizenship" and in response to a question therein "Have you ever been arrested or charged with violation of any law of the United States or state or any city ordinance or traffic violation" he answered "Yes * * * convicted of misdemeanor in 1923 * * * traffic tickets but does not recall dates"; on December 27, 1933 he filed his "Petition for Citizenship" to which was attached the Declaration of Intention to become a citizen of the United States and a Certificate of Arrival, issued in 1933, which was based on the 1931 Record of Registry proceedings; on March 1, 1934 defendant executed and gave to the government an affidavit in which he admitted that he had concealed his criminal record; on November 20, 1934, the District Director of Immigration and Naturalization filed "Opposition by United States to Granting of Citizenship", reciting inter alia, the defendant's concealment of his criminal record in his interrogation by a United States Naturalization Examiner on December 27, 1933; on February 27, 1935, defendant filed "Consent of Dismissal of Petition for Naturalization."

In 1943, the defendant, then in the United States Army, asked the permission of his Commanding Officer to institute naturalization proceedings under provisions relating to servicemen by filing a "Preliminary Form for Petition for Naturalization" which he had executed on December 30, 1942. The defendant filled out a required ten-page "Personal History Statement" on March 18, 1943, which disclosed that he had a police record. The defendant's Commanding Officer approved the defendant's application to file his petition for naturalization and transmitted it with his approval to the Chief Examiner of the Immigration and Naturalization Service at Philadelphia, Pennsylvania.

Subsequently the defendant's application was sent to the Records and Verification Division of the Immigration and Naturalization Service, which maintains arrival records at the Port of New York. There the crew list of the ship upon which the defendant had arrived was located. The verification clerk made the following entry on April 23, 1943, on the reverse side of defendant's application: "Data taken from Crew List—Deserting Seaman—No record of admission for permanent residence."

On April 28, 1943, a "Certificate of Arrival" was issued to the defendant. The Immigration and Naturalization Service then forwarded to George C. Reich, a designated examiner, its file relating to the defendant's original naturalization proceedings in 1931–1935 (which had been abandoned) and the then current 1943 proceedings. Reich, on June 29, 1943, proceeded to Indiantown Gap, Pennsylvania, where the defendant was stationed, and orally examined him with respect to his application.

Reich's testimony in the denaturalization proceedings in the District Court with respect to his examination of the defendant, is most illuminating.

Its highlights follow:

Reich *had with him the file* of the Immigration and Naturalization Service relating to the 1931–1935 and 1943 naturalization proceedings when he examined the defendant.[1]

The file contained police records of the defendant's arrests which he had fraudu-

---

1. "A. I carried the file from our office in Philadelphia to Indiantown Gap where the examination was conducted." N.T. pp. 64–65.

lently concealed in his 1931 application.[2]

Reich examined the defendant in detail with respect to his criminal record as it appeared in the file.[3]

Reich "knew" that the file contained an affidavit which the defendant had executed and given to the government March 1, 1934, in which he admitted that he had concealed his criminal record.[4]

Reich "knew" from the file that the defendant had been issued a Certificate of Registry and a Certificate of Arrival and that a new Certificate of Arrival was issued him in 1943 supplanting the earlier arrival certificate.[5]

Reich "knew" when he examined the defendant that he originally entered the United States as a "deserting seaman." [6]

Reich spent "more time on the review" of the defendant's naturalization files (1931–35 and 1943) and on "his examination" of the defendant than on the "average case" at the Indiantown Gap interview.[7]

Reich "knew", from his "complete" examination of the "entire file" before he examined the defendant, that his earlier attempt at naturalization in 1931–35 in New York had been "denied".[8]

2. "Q. Did it (the file) contain any police records from any governmental agencies enumerating any arrests of the defendant? A. It did, the New York prior petition file contained a record submitted by the New York Police Department to our office.
"Q. You distinctly recall that there was such a police report in the file? A. Yes, sir, I do." N.T. pp. 88–89.

3. "Q. Did you review with Mr. Anastasio the arrests disclosed in the '33 or '34 file? A. Yes, sir, I did." N.T. p. 71.
* * * * *
"Q. Do you recall specifically the questions concerning his criminal record which you put to him and the answers which he gave to you? A. Yes, sir." N.T. p. 106.
* * * * *
"Q. Now, you read him a list of arrests, is that correct? A. That is correct.
"Q. What were you reading from? A. I was reading from a record in the file listing his arrests." N.T. p. 108.

4. "A. The * * * file contained * * an affidavit by the petitioner as to his own arrests at the time the New York file was pending." N.T. p. 134.

5. "Q. Was there a certificate of arrival attached to the petition (the 1943 petition) when you got it? A. When the application was reviewed by me there was a certificate of arrival attached to the application file."
* * * * *
"Q. Is there anything on that certificate of arrival which indicates to you that it was issued on the basis of a registry proceeding? A. Yes, sir; this copy shows *certificate of arrival previously issued under No. 2R. The R signifies*

*it was pursuant to a registry proceeding.*" N.T. pp. 71, 72–73 (emphasis supplied).

6. "Q. Now at the time of the naturalization in 1943 did you pay any particular attention to the Wilkerson notation on there (the 1943 file) that Mr. Anastasio had been a deserting seaman? A. I saw it." N.T. p. 153 (Wilkerson was the verification clerk in the Records Division of the Ellis Island office of the Immigration and Naturalization office who processed the defendant's 1943 naturalization petition and who noted thereon, on April 23, 1943, that he was a "deserting seaman").

7. "Q. Now did you spend any more time on the review of this man's file and your examination of him than you did on the average case that day? A. Yes, I did." N.T. p. 154.

8. "Q. Now, do you recall what constituted the file that was in your hands when this interview took place? A. Yes, I had the Philadelphia file, which to my recollection consisted of his application for naturalization and the approval of his commanding officer for naturalization; *together with a New York petition for naturalization* filed, which was *a denied petition.* That is all.
"Q. Did you examine the file in advance of the interview? A. The applicant was standing in front of me while I examined the file, before I started the interview. Before I said anything to him *I examined the file completely.*
"Q. You read over the entire file before you began to interrogate him? A. I examined the file. I didn't read every word of the file." Deposition of Reich, December 17, 1953, pp. 21–22 (emphasis supplied).

Reich recommended that the defendant's application be granted because he was of the opinion "that there was no legal evidence in the file which would sustain an objection"; the defendant's various arrests "disclosed * * * or uncovered in 1934" were at the time "outside the statutory period and the defendant's commanding officer had approved his application." [9]

On the record as stated the District Court found (Finding of Fact VIII) "The Certificate of Arrival (granted on April 28, 1943) had its origin in the false record of registry (issued in 1931) * * * theretofore made by the defendant, and therefore its use in the naturalization proceedings (in 1943) was a fraud upon the Court. *The fraud tainted every step of the naturalization proceedings* (from 1931 to 1943)." (Emphasis supplied.)

We are of the opinion that the District Court erred in its determination. On the score of the latter it must be observed that the District Court made no findings with respect to Reich's testimony and its impact upon the critical issue as to whether the government had been defrauded in 1943 in recommending the defendant's naturalization.

■ A denaturalization proceeding is essentially an action for rescission. As in all rescission actions, the government in order to prevail must establish that (1) the defendant was guilty of fraud or misrepresentation and (2) it was deceived thereby.

■ In our opinion the record fails to establish the government was deceived into granting the defendant citizenship in 1943 pursuant to the independent naturalization proceeding which he instituted that year.

Moreover, we believe the record affirmatively establishes by the undisputed testimony of the government's key witness, and the inferences inevitably flowing from that testimony, that the defendant did not in 1943 practice fraud or illegality upon the government.

With respect to denaturalization proceedings these principles are well-settled:

■ The premise of a denaturalization action is fraud or illegality allegedly practiced by the defendant in the naturalization proceeding which deceived the government or the court into granting citizenship.[10]

■ The burden is on the government to establish by " 'clear, unequivocal, and convincing' evidence which does not leave 'the issue in doubt' " that the defendant has been guilty of fraud or illegal conduct in his naturalization proceeding.[11]

■ There must be a " * * * solidity of proof which leaves no troubling doubt in deciding a question of such gravity as is implied in an attempt to reduce a person to the status of alien from that of citizen." [12]

---

9. "Q. Now you made a recommendation of 'Grant' in his case, didn't you? A. That is correct.
"Q. Will you tell us, please, what it was that motivated your recommendation of 'Grant'? A. I felt there was no legal evidence in the file which would sustain an objection.
"Q. That these arrests which had been disclosed in 1934, or uncovered in 1934, that they had been outside the statutory period? A. Yes sir, they were 10 years prior to the time of the defendant's petition for naturalization.
"Q. Did the recommendation of the commanding officer concerning approval of this man's application for citizenship in any way affect your thinking? A.

Very definitely. It showed that he had been serving honorably in the armed forces of the United States, and from other parts of the file, he had been serving for almost a year at that time." N.T. pp. 154–155.

10. Knauer v. United States, 1946, 328 U.S. 654, 66 S.Ct. 1304, 90 L.Ed. 1500.

11. Schneiderman v. United States, 1943, 320 U.S. 118, 158, 63 S.Ct. 1333, 1352, 87 L.Ed. 1796; Klapprott v. United States, 1949, 335 U.S. 601, 612, 69 S.Ct. 384, 93 L.Ed. 266.

12. Baumgartner v. United States, 1944, 322 U.S. 665, 670, 64 S.Ct. 1240, 1243, 88 L.Ed. 1525.

In a denaturalization case "* * * the facts and the law should be construed as far as is reasonably possible in favor of the citizen." [13]

An essential element of fraud is that the complaining party must have been deceived by the fraudulent statements of the accused. If this element is lacking the accused has failed in his purpose to defraud.[14]

Applying these principles to the instant case it is obvious that the government has failed to establish by the strict burden of proof imposed upon it that the defendant had "deceived" it into recommending citizenship in 1943.

To begin with, the government does not dispute that the record conclusively established that when it recommended granting of citizenship to the defendant in 1943 it then knew these facts: the defendant had originally entered the United States as a "deserting seaman"; he had fraudulently concealed his criminal record in his New York naturalization proceedings a decade earlier; he had confessed his fraud in an affidavit in 1934; the government, because of his fraud, had denied his naturalization petition and had further opposed the defendant's court proceedings instituted in 1934 in an effort to win his citizenship; this opposition had resulted in the defendant's formal consent, in 1935, to a dismissal of his naturalization petition in the then pending court action.

Further, the government does not dispute that it had, in the course of processing the defendant's 1943 naturalization petition, ascertained that (1) a Certificate of Arrival had been issued to the defendant in 1933 pursuant to his application for such a certificate in his Preliminary Form For Petition for Citizenship No. 2–171106 filed November 16, 1933; (2) a Certificate of Registry had been issued to the defendant on June 16, 1931;[15] and (3) it had *at its own instance* and *not upon any application made by the defendant* in connection with his 1943 petition for citizenship, issued a new Certificate of Arrival on April 28, 1943.

Parenthetically, it should be noted that the Preliminary Form for Petition for Naturalization executed by the defendant on December 30, 1942 made no reference to either a Record of Registry, Certificate of Registry or Certificate of Arrival; that the government conceded that in servicemen's naturalization proceedings it normally issued a qualified Certificate of Arrival where there had not been "a lawful admission for permanent residence" [16]; that the only reason such

13. Schneiderman v. United States, supra, note 11.

14. 23 Am.Jur. on Fraud and Deceit, Sec. 20; Equitable Life Ins. Co. of Iowa v. Halsey, Stuart & Co., 7 Cir., 1940, 112 F.2d 302, 308.

15. The record in the denaturalization proceedings disclosed that the government had ascertained in its investigation of the defendant's application for registry in 1931 that he had made an "illegal entry" into the United States; that he had been listed "as deserting" by the vessel on which he had been employed as a seaman; that in his application for registry the defendant stated that he had "never been arrested * * * convicted, fined, imprisoned, etc."; that the defendant had testified at a hearing on his application for registry that he had never been arrested, convicted, etc.

16. Testimony of Bernard J. Kelley, Supervisor of the Records Unit, New York District, Immigration and Naturalization Service in 1943, a government witness (N.T. pp. 43–44–45):

"Q. As a matter of practice if form 403 were submitted by a soldier would show that he had entered the United States in a temporary status, such as a seaman, and your further search of your records indicated that there had never been a record created of registry, what would your practice then be? A. Instead of the application being forwarded to the Central Office, as it was in a registry case, it would have been returned to the office of origin with the verification of arrival.

"Q. In such a case do you know whether a certificate of arrival would issue? A. It was the practice to issue qualified certificate of arrival and in those cases subject to the acceptance of the naturalization examiner.

a qualified Certificate had not been issued in the instant case was because the government's records disclosed there had been a registry proceeding in 1931. On the latter score Reich testified, in connection with his previously stated testimony that he knew the 1943 Certificate of Arrival was based on a registry record, that he had not checked the latter although he could have done so had he desired.[17]

The government (1) was fully aware that the defendant had, in the New York naturalization proceedings, fraudulently concealed his full arrest and criminal record when he filed his application for a Certificate of Arrival contemporaneously with his filing of preliminary petition for citizenship in 1933 since the "Application For A Certificate of Arrival and Preliminary Form For Petition For Citizenship" appear in a single document (Form A–2214)[18] and that it had successfully opposed the defendant's naturalization at that time because of the defendant's fraud; (2) it was fully aware in the 1943 naturalization of what had transpired in the New York proceedings; (3) it was fully aware of the existence of the 1931 registry proceedings and the government must have realized both in the New York proceedings and in 1943 that the defendant had committed the same fraud in his registry proceedings with respect to concealment of his criminal record as he did in his Form A–2214, otherwise the government would not have issued a Certificate of Registry.

Reich was an experienced naturalization examiner when he interviewed the defendant in 1943 and recommended granting of his petition for naturalization. He had been appointed to that office in 1939 and between that time and his examination of the defendant had processed between 8,000 and 9,000 naturalization examinations. He must have realized, as did the various offices of the Immigration and Naturalization Service which processed the defendant's New York and 1943 applications, that the defendant had fraudulently concealed his criminal record in his registry proceeding in 1931 (as he did in his New York proceeding) else he would not have been granted his Registry Certificate.

In the light of these circumstances how can it be said that the government was the "victim" of any fraud on the part of the defendant when it recommended his naturalization in 1943? It specifically knew of the fraud committed in his New York proceedings; it specifically knew of his full criminal record. There is no actionable fraud if before any change occurs in the relationship of the parties the accused himself discloses the information that earlier misrepresentations which he had made were false, for if a new relation is effected subsequent to such disclosure the legal status of that relationship is the same as if the fraudulent statement had never been made.

The government inescapably finds itself in an inequitable position when it is realized that a new record of registry would have been issued in 1943 upon the defendant's application since the only requirement he would have had to meet related to his then "good moral character" and Reich had attested to its existence when he recommended the defend-

---

"Q. Was your office at that time, or were you, under instructions from superior officers to issue certificates of arrival in the case of soldiers where the only record showed entry as a seaman? A. It was the practice to issue a formal certificate of arrival, qualified to indicate that it wasn't a lawful admission for permanent residence."

17. "Q. Did you requisition the registry file? A. I did not.

"Q. Did you have the authority to requisition the registry file? A. I did." (N. T. p. 97)

18. In filling out Form A–2214 the defendant stated he had *not* been examined by United States immigration officials when he entered this country; that he had *not* paid a head tax; that he had no criminal record other than a conviction "of misdemeanor in 1923" and some traffic violations.

ant's naturalization on the ground that "there was no legal evidence in the file which would sustain an objection" since the defendant's criminal record was "outside the statutory period" and had been made "10 years prior to the time of the defendant's petition for naturalization". If the defendant's more than 10-year old criminal record did not create a bar to naturalization it follows that it would have not barred granting of a new registry.

Moreover, the defendant had no reason to believe that a new registry certificate was required. He had acquitted himself of the duty to divulge *all* relevant information to the government. He was entitled to assume that his case now rested with the government and that it would inform him of any infirmity in his application and if necessary oppose his naturalization on the basis of such infirmity.

It must be remembered that we are here concerned not with a naturalization proceeding where a privilege is sought, but with an action to denaturalize. As such the burden lies heavily with the government to cut square corners. The Supreme Court has spoken clearly and often on the independent close scrutiny that courts should make in such proceedings. Schneiderman v. United States, 1943, 320 U.S. 118, 122, 63 S.Ct. 1333, 87 L.Ed. 1796; Klapprott v. United States, 1949, 335 U.S. 601, 612, 69 S.Ct. 384, 93 L.Ed. 266.

Furthermore it is relevant to note that the defendant was naturalized under the liberal provisions of the Nationality Act of 1940, designed specifically for those in the armed forces.[19] This circumstance strengthens our conviction that the government has established no tenable basis for this action.

We are fully aware of the unsavory background of this particular defendant.

But the very fact that *extrinsic* considerations may operate to make the government zealous in its prosecution should make the courts equally zealous to see that there be conformance to the letter and spirit of the naturalization laws.

No criticism is implied of the Justice Department's "deportation program" with respect to naturalized racketeers, noted in the Supreme Court's recent opinion in Shaughnessy v. United States ex rel. Accardi, 349 U.S. 280, 75 S.Ct. 746, but no matter how worthy the cause or its objective, the courts cannot lose sight of the fact that this is a government by law and not men nor against men.

The courts must be less concerned with what one undesirable citizen can do if he is permitted to retain his citizenship and residence in this country than with what one bad precedent-making decision can do.[20]

For the reasons stated the judgment of the District Court will be reversed and vacated.

LORD, District Judge (dissenting).

Defendant has argued many issues on his appeal. However, there is only one real question to be determined and that is:—was the Certificate of Naturalization procured by fraud? In the determination of this issue it is necessary to decide whether the Certificate of Registry was a part of the naturalization proceeding.

What "naturalization proceedings" were required in this case? Defendant's application for citizenship in 1942 was controlled by the Nationality Act of 1940, 8 U.S.C. §§ 501–907, as amended, 8 U.S.C. § 1001 (1942 Supp.).* Section 1001 provides:

"Notwithstanding the provisions of sections 703 and 726 of this title,

---

19. Para. (5) of a Stipulation filed by the parties in the District Court disclosed that the defendant had enlisted in the Army on July 20, 1942, and was honorably discharged November 22, 1944, with the rank of Sergeant.

20. The Defendant recently pleaded guilty to income tax evasion and was sentenced to imprisonment for one year.

* Now Immigration and Nationality Act of 1952, 8 U.S.C.A. §§ 1101 et seq., 1440.

any person not a citizen, regardless of age, who has served or hereafter serves honorably in the military or naval forces of the United States during the present war and who, having been lawfully admitted to the United States, * * * shall have been at the time of his enlistment or induction a resident thereof, may be naturalized upon *compliance with all the requirements of the naturalization laws* except that * * *." (Emphasis supplied.)

The necessity to attach a Certificate of Arrival to the petition for naturalization was not eliminated by any of the exceptions noted in the Act. Such Certificate of Arrival was required under the Naturalization Act (1940) in effect at the time defendant applied for citizenship, 8 U.S.C. § 732(c) (1940),[1] and therefore was a necessary part of defendant's naturalization proceedings in 1942 and 1943.

The evidence in the record indicates that the Certificate of Arrival attached to defendant's petition for citizenship was based on the fraudulent Application for Registry made by defendant in 1931. There can be no doubt that defendant needed a Record of Registry and Certificate of Arrival for his original naturalization proceedings initiated in 1931. See pertinent provisions of the Act of June 29, 1906, 34 Stat. 596,[2] as amended by the Act of March 2, 1929, 45 Stat. 1512.[3] The substance of these requirements appear also in the Nationality Act of 1940, 8 U.S.C. §§ 728, 729.[**]

1. "At the time of filing the petition for naturalization there shall be filed with the clerk of court a certificate from the Service, if the petitioner arrived in the United States after June 29, 1906, stating the date, place, and manner of petitioner's arrival in the United States, and the declaration of intention of such petitioner, which certificate and declaration shall be attached to and made a part of said petition." Now 8 U.S.C.A. § 1445 (a, b).

2. Section 1 of the Act of June 29, 1906: "That it shall be the duty of the said Bureau to provide, for use at the various immigration stations throughout the United States, books of record, wherein the commissioners of immigration shall cause a registry to be made in the case of each alien arriving in the United States from and after the passage of this Act of the name, age, occupation, personal description * * *, the place of birth, the last residence, the intended place of residence in the United States, and the date of arrival of said alien, and, if entered through a port, the name of the vessel in which he comes. And it shall be the duty of said commissioners of immigration to cause to be granted to such alien a certificate of such registry, with the particulars thereof."

3. "That * * * the registry of aliens at ports of entry required by section 1 of the act of June 29, 1906 * * *, as amended, may be made as to any alien not ineligible to citizenship in whose case there is no record of admission for permanent residence, if such alien shall make a satisfactory showing to the Commissioner General of Immigration, in accordance with regulations prescribed by the Commissioner General of Immigration, with the approval of the Secretary of Labor, that he—

"(1) Entered the United States prior to June 3, 1921;

"(2) Has resided in the United States continuously since such entry;

"(3) Is a person of good moral character; and

"(4) Is not subject to deportation.
* * * * *
"Sec. 2. Upon the making of a record of registry as authorized by section 1 of this Act, the certificate of arrival required by the fourth paragraph of the second subdivision of section 4 of such Act of June 29, 1906, as amended, may be issued upon application to the Commissioner of Naturalization, in accordance with regulations prescribed by the Commissioner of Naturalization, with the approval of the Secretary of Labor, and upon payment of the fee prescribed by section 5 of this Act.

"Sec. 3. For the purposes of the immigration laws and the naturalization laws an alien, in respect of whom a record of registry has been made as authorized by section 1 of this Act, shall be deemed to have been lawfully admitted to the United States for permanent residence as of the date of his entry."

** Now Immigration and Nationality Act 1952, 38 U.S.C.A. §§ 1230, 1259(a, b), 1429.

A reading of the statutory requirements clearly reveals the necessity for a Certificate of Arrival. United States v. Ness, 1917, 245 U.S. 319, 38 S.Ct. 118, 62 L.Ed. 321; Maney v. United States, 1928, 278 U.S. 17, 49 S.Ct. 15, 73 L.Ed. 156. That the Certificate of Arrival was based on the Record of Registry is also clear by the evidence revealed in the record and by the fact that such procedure was required under Section 2 of the Act of March 2, 1929, 45 Stat. 1512, supra, footnote 3.

It is true, as the majority points out, the crew-list substantiates the necessary information on the Certificate of Arrival. However, the Record of Registry was required (when defendant in 1931 applied for citizenship) under the Act of Mar. 2, 1929, 45 Stat. 1512, before a Certificate of Arrival could be given. Thus it follows that the court below was correct in its finding that the Certificate of Arrival had its origin in the fraudulent Record of Registry made by the defendant. The fraud in the original proceeding permeated the subsequent issuance of the Certificate of Arrival which was attached to defendant's naturalization petition in 1943. Defendant's contention that a Record of Registry would not have been necessary for the issuance of a Certificate of Arrival is without substance, because, in fact, the Certificate of Arrival *was* based on the Record of Registry in this case. Since the Record of Registry was procured by fraud, it follows that the Certificate of Arrival was tainted with the same fraud.

As indicated by the majority opinion, Reich's testimony is important. However, in *support* of the District Court's finding that the Certificate of Arrival had its origin in the fraudulent Record of Registry, the following highlights of Reich's testimony should not be ignored:

Reich did not have the *complete file* relating to the 1931–1935 naturalization proceedings when he examined the defendant, and, particularly, *did not have the registry file.*[4]

Reich's office was not part of the New York Office.[5]

While Reich knew of the affidavit made by the defendant in 1934, it merely recited instances of prior arrests and the fact that such arrests were not stated to a previous examiner in 1933. However, the affidavit was made *after* the Application for Registry was filed in 1931 and *after* defendant had given false answers to the Registry inspector as a result of which the Certificate of Registry was granted in 1931. There is *nothing in the affidavit* to show a concealment in the Record of Registry since the affidavit referred only to the naturalization proceedings in 1933.[6]

Reich spent only 15 minutes reviewing the file of defendant and only 10 minutes of oral examination before recommending the granting of citizenship.[7]

Reich's recommendation to grant defendant's application was based only on

---

4. "Q. Was there a certificate of arrival attached to the petition when you got it? A. There was a certificate of arrival—" (N.T. p. 71)

   \*    \*    \*    \*    \*

   "Q. On top of that it indicates that a similar certificate of registry had been issued at another time in connection with this New York naturalization application? A. That is correct.

   "Q. Now, did you have the registry file before you at that time? A. No, sir, I did not." (N.T. p. 72)

5. "Q. Incidentally, at that time you were attached to the Philadelphia Field Office? A. That is correct.

"Q. And that is separate and apart and distinct from the Central Office? A. That is correct." (N.T. p. 75)

6. Exhibit P–13:

   \*    \*    \*    \*    \*

   "That during the course of his examination deponent was asked various questions as to his eligibility for naturalization and at that time was also asked if he had ever been arrested or convicted of any crime. Deponent stated to the naturalization examiner that \*  \*  \*."

7. "Q. How much time did you spend examining his file? A. Fifteen minutes.
   "Q. That means you questioned him for about 10 minutes? A. That's right." (N.T. pp. 101–102)

evidence before him which *did not include the Registry Certificate.*[8]

While the officers of the Naturalization Service knew of the previous arrests about which defendant was truthful in 1943, these were discounted *then* because they occurred ten years prior to 1943 and were outside the statutory period. However, the fact remains that the petition for naturalization was granted on the basis of the 1943 examination of defendant *and* the 1931 Registry Certificate *which was fraudulently obtained.* Defendant's subsequent revelations of his arrest record did not purge the original fraud.

The Government examiner, while knowing of the defendant's criminal record in 1943, *did not know* that the defendant had affirmatively concealed his arrests in the 1931 Record of Registry, on which the examiner relied. True, somewhere in the files of the New York Central Office of the Immigration and Naturalization Office the information was available, but the official (Reich) who recommended approval of the naturalization in 1943 (over twelve years after the fraudulent Record of Registry) did not know of the fraud and was deceived thereby. Can it be said that the Government should be estopped now in its charge of fraudulent naturalization because the information concerning the fraud was somewhere in a twelve-year-old file which was not brought to the attention of the examiner? The fraud still had been perpetrated on the Government and defendant's citizenship was granted partly on the basis of the fraudulent Record of Registry which the examiner did not have before him in 1943. The fraud was never condoned by such action.

The majority states that:

"* * * He [Reich] must have realized, * * * that the defendant had fraudulently concealed his criminal record in his registry proceeding in 1931 * * * else he would not have been granted his Registry Certificate."

I can find nothing in the record to justify this conclusion.

Reich attested to defendant's then "good moral character" in 1943 on the ground that "there was no legal evidence *in the file* which would sustain an objection" (emphasis supplied), since the defendant's criminal record was then "outside the statutory period." The majority argues that a new registry could have been secured on such a record in 1943. But the facts are that no new registry proceeding was conducted. The old fraudulent Registry Record was used. Reich did not have in his file the records of the old Registry Record. As careless and inefficient as this may appear, the act of proceeding on an *incomplete* file should not bar the Government from reconsidering the case in the future, when all the information is assembled properly.

Citizenship is a privilege that should be jealously guarded, and the defendant did not meet the requirements of entire good faith. He was definitely benefited in the granting of his application by the fraudulent Record of Registry on which the Certificate of Arrival was based. The Government had a right to rely on the statements of the defendant when the 1931 Registry Certificate was granted. It had no burden in 1943 to ascertain whether the defendant had been untruthful during the previous proceedings in 1931 which the majority opinion holds.

True it is, as the majority points out, that the burden of proof in a de-naturalization proceeding is admittedly greater than in an application for citizenship. Where a petitioner, in his original application for citizenship falsely denies being arrested or charged with violations of any law, such false statements of themselves involve moral turpitude and exhibit the unfitness of the applicant for the high privilege of citizenship. Del

---

8. "Q. Will you tell us, please, what it was that motivated your recommendation of 'Grant'? * * * A. I felt that there was no legal evidence *in the file* which would sustain an objection." (N.T. p. 154) (Emphasis added.)

Guercio v. Pupko, 9 Cir., 1947, 160 F.2d 799. A fortiori, if an applicant is refused citizenship because the Government has knowledge of the false statement, should any naturalized person be permitted to keep his citizenship as a reward for having been successful in his deceit? It is a fair statement to say that the defendant knew and realized the significance of his prior deceit when he withdrew his initial application. Since the information then requested was deliberately concealed, and a truthful answer then might possibly have prevented defendant from obtaining his citizenship in the first instance, the misrepresentation continued in his case and was present throughout the subsequent proceedings.

It would appear to be clear that the naturalization was illegally procured. It is evident that the Record of Registry was induced by fraud. The failure of the defendant to reveal his arrests was certainly sufficient cause for revocation of a certificate of naturalization. Brenci v. United States, 1 Cir., 1949, 175 F.2d 90; United States v. Saracino, 3 Cir., 1930, 43 F.2d 76; United States v. Accardo, D.C.D.N.J.1953, 113 F.Supp. 783, affirmed 3 Cir., 1953, 208 F.2d 632, certiorari denied 1954, 347 U.S. 952, 74 S.Ct. 677, 98 L.Ed. 1098. Such deceitful conduct of the defendant colored the entire naturalization proceeding.

Consequently, the statutory requirement of a valid Certificate of Arrival was not met by the defendant. As such, he has no right to naturalization. United States v. Ginsberg, 1917, 243 U.S. 472, 475, 37 S.Ct. 422, 61 L.Ed. 853; Maney v. United States, 1928, 278 U.S. 17, 22, 49 S.Ct. 15, 73 L.Ed. 156.

I would affirm the judgment of the district court.

### On Petition for Rehearing.

Before BIGGS, Chief Judge, and MARIS, GOODRICH, McLAUGHLIN, KALODNER, STALEY and HASTIE, Circuit Judges.

### PER CURIAM.

The petition for rehearing raises no issue not previously considered and correctly decided. On the facts of this case we do not regard our prior decision in United States v. Accardo, 3 Cir., 1954, 208 F.2d 632, certiorari denied 1954, 347 U.S. 952, 74 S.Ct. 677, 98 L.Ed. 1098, as requiring a contrary result.

Accordingly, the petition for rehearing is hereby denied.

BIGGS, Chief Judge (dissenting).

I am forced to the conclusion that the petition for rehearing should be granted and that the appeal should be heard by the full court. The present decision is contrary to our *per curiam* affirmance of United States v. Accardo, 3 Cir., 1954, 208 F.2d 632, certiorari denied, 1954, 347 U.S. 952, 74 S.Ct. 677, 98 L.Ed. 1098, and seems to charge a naturalization court with a kind of constructive notice of any prior fraud or fraud committed by an applicant for citizenship. If a naturalization examiner negligently is unaware of a fraud committed by the applicant, or if the examiner, in the exercise of his own judgment erroneously deems the fraud to be inoperative or insufficient to prevent naturalization, the examiner's negligence or error under the present ruling seems to be imputable to the naturalization court itself. But the naturalization examiner is an arm of the federal executive and unconnected with the judiciary, state or federal. An error of negligence or judgment committed by the executive cannot properly be imputed to the judicial branch. The principle enunciated by this court would seem to estop the executive under circumstances such as those at bar from raising the issue of fraud and also would prevent a federal court from exercising the power to cancel a certificate of naturalization conferred on it by Congress.

These issues are of grave consequence. I dissent from the denial of the petition for rehearing before the court en banc.

McLAUGHLIN and STALEY, Circuit Judges, join in the above dissent.