## UNITED STATES v. REINSCH.
### No. 496.

District Court, W. D. Washington, S. D.
June 23, 1943.

J. Charles Dennis, U. S. Atty., and Harry Sager, Asst. U. S. Atty., both of Tacoma, Wash., and G. D. Hile, Asst. U. S. Atty., of Seattle, Wash., for plaintiff.

A. O. Burmeister and G. C. Nolte, both of Tacoma, Wash., for defendant.

BLACK, District Judge.

In this proceeding I am confronted with a practical problem in psychology. It is my task to determine from the evidence what the defendant in 1912 actually thought of this country and of Germany; where his real allegiance lay; whether the oath he took thirty-one years ago was a sham or from the heart.

The government seeks to cancel the naturalization of the defendant in 1912 by the United States District Court for the District of Colorado upon the grounds that the defendant then falsely swore that he intended to renounce forever all allegiance and fidelity to Germany and then falsely swore that he would bear true faith and allegiance to the United States of America.

The proceeding is brought under Section 338 of the Nationality Act of 1940, 8 U.S. C.A. § 738.

■ The fact that thirty-one years has elapsed since the defendant was admitted to citizenship does not bar this proceeding to denaturalize him. If the defendant did in truth in April, 1912, intend to retain allegiance to Germany and did not then intend that his sole allegiance should be to the United States, and if such was suffi-

ciently established by the evidence at this trial then a decree vacating his citizenship should enter in spite of the many years intervening between the entry of the order of naturalization and the trial. That the lapse of time does not bar the government in this type of proceeding has been established by a number of cases. See United States v. Wursterbarth, D.C.N.J., 249 F. 908; United States v. Darmer, D.C.Wash., 249 F. 989; Schurmann v. United States, 9 Cir., 264 F. 917, 18 A.L.R. 1182; United States v. Herberger, D.C.Wash., 272 F. 278.

Therefore, the issue before the court is one of fact.

Plaintiff presented about twenty-six witnesses at the trial, which number included the defendant, who was examined in open court at such time as well as previously thereto by deposition, which deposition was admitted in evidence. With the exception of the defendant's testimony practically all of the witnesses presented by the government, to a greater or less degree, related statements by the defendant and circumstances supporting the government's contention. The defendant, however, submitted the testimony of approximately the same number of witnesses in support of his position. In fact, a substantial number of the defendant's witnesses stated that during their acquaintance with the defendant they had never heard him say anything or observed him do anything which caused them to believe that he was other than a loyal American citizen. The government offered a number of exhibits, a portion of which were admitted at the trial, some being rejected and ruling being reserved as to the balance. The defendant offered a very much larger quantity of exhibits, regardless of the number, of which many were admitted at the trial, and ruling was reserved as to the admission of the rest.

Under all the circumstances in this case I am satisfied that such exhibits, offered by defendant, concerning which there was a reservation of ruling, should each be, and the same are hereby, admitted in evidence, and also am satisfied that Exhibits 6, 10, 12 and 13 offered by plaintiff with ruling reserved, should be, and same are, admitted. The other exhibits offered by plaintiff not heretofore admitted are rejected.

At first blush there may appear to be a hopeless contradiction in the great mass of evidence presented to the court in this extended trial. But to my mind an analysis of the testimony of every witness and of each exhibit introduced makes certain the correct decision. I am completely convinced by the evidence that the defendant at the time in 1907 when he declared his intention to become an American citizen, in April, 1912 when he took the oath of allegiance, at the time of the institution of the action, at the time of the trial, and at all intervening periods, was disloyal to the United States and was loyal to Germany. It follows necessarily that I shall hold that the defendant was guilty of fraud against this government and the court which granted him citizenship and that his naturalization should be cancelled and revoked.

The testimony as a whole demonstrates that the defendant's allegiance was to Germany and not to the United States during the First World War, and during this one, as well as during the periods preceding each such war.

My decision against the defendant does not mean that I disagree with the honesty of all of the witnesses presented by the defendant. Outside of the testimony of the defendant and his wife I feel that almost every witness presented by the defendant was sincere and gave his honest recollection and opinion.

The defendant, as demonstrated by his very substantial income, is a man of outstanding ability especially as a log and lumber buyer. And he is a man of exceeding industry and thrift as well as loyalty to his family and his work. But he has not been loyal to the country which gave him much opportunity and increasing recompense for his skill and energy. It is true he worked long hours and efficiently for his company after it became engaged in filling only war orders. But as a company officer in effect testified, if he had not been efficient his services would have terminated. Undoubtedly defendant was determined, whether Germany won or lost, to have an important post with that plant.

It just so happens that the defendant was two individuals: one of such individuals was the real defendant, who was loyal to Germany and disloyal to the United States and who only disclosed his real feelings to certain individuals. The other individual was the defendant as he posed and pretended to be when he deemed such pose and pretense advantageous to himself.

The defendant has been ably represented by learned and experienced counsel who have brought to his defense much preparation as well as skill and vigor.

But defendant, in his deposition and during the course of his trial, felt compelled to admit under oath a great many things which, even if there was no other evidence in the case, would make it extremely difficult for me to consider him disloyal to Germany or attached to the United States. Practically none of his witnesses, other than his family, knew these facts. In other words, almost all of defendant's witnesses mistakenly thought he was an entirely different individual than he, under oath, admitted himself to be.

It is appropriate to here relate some of such admissions. The defendant admitted that last fall he told the two agents of the Federal Bureau of Investigation interviewing him that he would not insult the German Gestapo by comparing them with the F. B. I.; he also admitted that he probably told them that up to Pearl Harbor he considered Germany right, and that he probably told them "You bet," he wanted Germany to win, but he denied he told the F. B. I. agents that after Pearl Harbor he still considered Germany right and that he still wanted Germany to win, and contended that he instead evaded and parried the question of whether he wished Germany to win after Pearl Harbor; the defendant, at the trial or in his deposition, further admitted that he had purchased no American Defense Bonds or War Bonds at all during the present war or in the period leading up to it; that except for a little loose change that he claims he may have given in 1942, that neither in 1941, 1942 nor 1943 did he make any contribution to the Red Cross; that from 1938 or 1939 he was a member of the Silvershirts until that organization was disbanded in 1940; that he loaned $1,200, mostly after Pearl Harbor, to William Dudley Pelley, since convicted of sedition, to aid, as he claimed, in the issuance of Pelley publications; that he gave outright approximately $1,000 or more (about $600 of it after Pearl Harbor) to a number of individuals, directly or to their families, each of which individuals likewise before this trial had at least been indicted for sedition; that he had bought German bonds about 1938 and that when he sold same he deposited the proceeds in a German bank which he claimed was to be in trust for his mother's use; that he had sent a substantial amount of money to his folks in Germany; that in 1942 after we were involved in war he gave $25 as a contribution for the German war prisoners held in Canada; that for several years he had received certain of the Pelley publications and handed some of them out from time to time to certain individuals; and he claimed that he destroyed most of his checks shortly after they were returned from the bank and that he kept no check stubs.

The numerous exhibits of clippings and letters by defendant and his wife offered by defendant and admitted in evidence, and the scrap book referred to, indicate a very surprising inclination to keep many things which ordinarily would be discarded. Yet defendant testified that the reason that he so quickly destroyed most of his cancelled checks was that the paper took up too much room.

While a number of persons with whom the defendant associated must necessarily have known one or more of these facts and circumstances so admitted by him, he chose to call as his witnesses in nearly every instance only those who apparently did not know these most important matters.

The court is, therefore, convinced that practically every witness for the defendant, had he been aware of such circumstances, would have testified very differently than he did.

In addition to what the defendant admitted I am convinced by and find from the evidence that among the many statements that defendant made to one or more witnesses are the following:

Before Pearl Harbor defendant said Hitler would win the war. After Pearl Harbor defendant said our administration's foreign policy had forced Japan to strike at Pearl Harbor. Defendant said Hitler had done great things for Germany and Hitler was justified in his attitude toward the Jews. Defendant stated to more than one person that he had attended a Bund meeting or meetings in Seattle. Defendant said on several occasions the reason he did not return to Germany was because of his job and his family's being here. Defendant told an automobile salesman the reason he was buying a certain Ford car was because Ford refused to build airplane motors for England and that the people did not know what a great man Hitler was. Defendant said to another witness that Hitler was pure gold, that if we had Hitler

over here things would be better, and that he would return to Germany "tomorrow" if his family were not located in the United States. Defendant, considerably after Pearl Harbor and about ten months before the trial, told another witness, "By God" he would not buy any Victory or Liberty Bonds. Several years ago defendant told his then secretary, who was most reluctant to have to testify against him, that Germany was all right, that some time Germany would rule the world, and that German rule was right. Defendant told a subsequent secretary of his who served him for about two years preceding October, 1942, that Germany was not to blame for this war, that England and the United States were responsible for all the wars that had occurred, that he disapproved of the Red Cross, that she could do better than put her money in Defense Bonds, that he wished he had left this country five years previously when he had the chance. Last fall in the presence of two government witnesses defendant said the barter system was preferable to this country's money system, that the Versailles Treaty was unjust, that he received all the Pelley publications and read part of them, that until after his 1935 visit to Germany he did not approve of Hitler's treatment of the Jews, that the United States had been unfair in imposing an embargo on iron and oil shipments to Japan, that up to the time the United States entered the war "You bet" he wished Germany to win, that since the United States was in he thought Germany was right and he hoped for Germany's victory, that he would not insult the Gestapo by comparing them with Biddle's stooges, and that the F. B. I. was Biddle's stooges. Defendant told another witness who was born in Hungary about defendant's 1935 visit to Germany and that he liked that form of government, that it would be a good one here, that Hitler was all right, that it would be all right if Hitler came over to this country and cleaned up the Jews, and after we were in the present war that he would like to see Germany win. During the First World War defendant told a witness in Big Lake that Germany was right and the defendant asked why he should be against Germany when his people were all in Germany. At about the same time and after this nation was in the First World War, defendant told another witness that he wished Germany to win and come out ahead of this country.

The defendant usually concealed such outright feelings as he occasionally expressed as above, just as he usually kept the following from practically all of his own witnesses, some of whom mistakenly thought they were intimates of his: his Silvershirt activities, the type of literature he received and on occasion handed out, his loans and contributions to Pelley and others finally charged with sedition, his 1942 gift for German war prisoners, or his failure to buy any American War Bonds. Ordinarily in conversation with one person he stated his view on one certain subject, and to another his view on one or two other subjects. When all his views expressed even to his own witnesses are collected and viewed as a whole they are found to be such as should be very satisfactory to a pro-Nazi German.

The defendant was extremely evasive as to the contents of the Pelley publications which he admittedly received and distributed, and asserted ignorance of same on the ground that he was so busy with his work that he had no opportunity to read. His wife, however, testified that he and she both for several years had read practically everything relating to economics and politics that they could find.

The government contended that I ruled too strictly against the government and in favor of defendant in rejecting some exhibits offered by the government. The government also contended that I ruled too strictly against the government in excluding certain testimony against defendant relating to the period of the First World War. Perhaps the government is right. However, in my opinion the rulings were within my discretion and proper. But the evidence admitted is still entirely sufficient to establish defendant's disloyalty to this nation and his allegiance to Germany, as is also the remaining evidence even if every publication admitted as a plaintiff's exhibit be entirely disregarded.

However, such Pelley publications as were admitted, particularly Exhibits 6, 7, 8, 9, 10, 12, 13 and the various issues of "Liberation" and Exhibit 26, which last was discovered in defendant's brief case in his car in 1941, would be a great shock to most of the defendant's witnesses were they to carefully read and analyze the same. It is not necessary to this decision for this court to pass upon the question of whether or not the Silvershirts, William

Dudley Pelley or such publications were disloyal. It is only necessary for this court to say that from the exhibits and under the evidence it is clear that the program and literature of the Silvershirts, of William Dudley Pelley, and said Exhibit 26 would appeal very much indeed to a pro-Nazi German residing in this country and looking for an opening wedge for later hoped-for German dominance.

Some of the Pelley literature introduced by the defendant is rather unimportant except from time to time there is a sarcastic fling at the English or the Jews and mention of Aryan sovereignty, which should not be distasteful to any person loyal to Nazi Germany. And likewise there occasionally appears disparagement of the Chinese and complimentary reference to Japan. But other portions of the Pelley literature have considerable in common with much of the Nazi propaganda pattern, regardless of whether we might think such similarity is merely coincidental or through design.

If defendant did not read at least much of the Pelley literature it is passing strange that he loaned any substantial part of $1,200 to continue their publication and handed copies of the same from time to time to other people, as he admits.* If he did read it and was loyal to Germany it is very understandable why he would chose to loan $1,200 to Pelley rather than to this government to defend against the Axis.

. The statements which the numerous witnesses presented by the government testify the defendant made are quite in harmony with expressions in Exhibit 26, with Exhibit 8, entitled "We Fight for This Republic Only", and extracts of Pelley's publications set out in Exhibit 7, being a pamphlet entitled "An Exact Copy of The Pelley Indictment for Sedition". Moreover, defendant was evasive as to the numerous gatherings and meetings which he attended in Tacoma and various other places as far south as Lewis County and as far north as Whatcom and as to the speakers, the discussions, what was said. Defendant did not present a single witness who had attended one of them. These gatherings were admittedly those either sponsored or at least largely attended by Silvershirts except as one was apparently under the auspices of the Bund.

Defendant's letter dated July 18, 1942, to the witness Marton, Exhibit 29, was very significant. Defendant's manner of testify-

ing, when he sought to explain or evade such letter, aside from his words, served to emphasize such significance. And such significance is much increased by reference to defendant's check to Pelley for $400 dated July 21, 1942, just three days after the letter to Marton.

It is well established by many court decisions that on a question of this kind the acts and conduct in time of stress, such as during actual or threatened war, can determine the real intent when the naturalization oath was taken although many years before. Citation of such frequent authority is here not necessary.

From the evidence the defendant is and has been for a number of years loyal to Nazi Germany and disloyal to this country and preceding and during the First World War he was loyal to Imperial Germany under Kaiser Wilhelm II and disloyal to the United States. Such to me make the conclusion inescapable that in 1912 he was loyal to Germany in his heart at the time his lips took the oath of allegiance to the United States. He became a citizen to aid his own advancement. At the trial he testified, in substance, that his attitude towards Germany and towards this country was just the same when he took the oath in 1912 as at all later times. Under the evidence he has been for the things Germany favored and against what Germany opposed.

The defendant has prospered amazingly in the United States and for a time, at least, about 1941 was receiving each month aggregate salary in excess of the annual salary of $1,100 he received soon after coming to America. Nevertheless, according to practically the uncontradicted testimony, he disapproved of or bitterly condemned everything this government has done for many years. True, he said it was the administration he condemned. It is very strange, however, that not a single witness, so far as I remember, testified to any approval by him of anything any administration has done in this country since he came here over thirty-six years ago.

While some disloyal person for various reasons might see fit to purchase American Defense or War Savings Bonds, it is difficult to imagine how a loyal person receiving even a small part of the large income the defendant did would fail to purchase at least a single one.

The personnel officer of the plant which employed defendant, a friend of defendant

who testified in his behalf, on being asked on cross examination what the defendant's statements were with respect to the war after the United States became involved, said that he avoided discussing the war with the defendant. Certainly after Pearl Harbor no one would avoid discussing the war with any one deemed loyal. The inference is very plain.

Every witness during plaintiff's case in chief from Big Lake, Skagit County, where defendant lived between 1913 and 1920, testified that during the First World War, both before and after our entry, that the defendant made statements either loyal to Germany or disloyal to this country. Although there was a week's interruption during the defendant's case the defendant did not bring a single person from that community to testify as to his loyalty then or ever. In fact, he admitted that he was in 1917 and 1918 accused by people in Big Lake with being pro-German after our entry in that war.

The defendant's membership in the Silvershirts, his loans and contributions to Pelley and to others finally charged with sedition, his receiving, possessing and distributing the literature in evidence, his attendance at the meeting in Seattle, and the other gatherings he attended, are important because they evidence that practically all of the witnesses he presented did not know the real defendant since they apparently were ignorant of such activities of his. These matters are also important since so much in harmony with the different statements which the government's witnesses testified he made, which statements when assembled, form a mosaic consistent with allegiance to Germany and its aims. They are further important because they emphasize his failure after December 7, 1941, to use any of his funds to aid this country's cause.

But if there were no evidence of Silvershirts, of any of such literature, of such loans and contributions, or of such gatherings in connection with defendant or at all still the other evidence of what defendant said and did in this present war after Pearl Harbor and before and in the First World War after we became involved, as well as previously, completely satisfy me that his deep attachment has always been to Germany, whether Imperial Germany or the German Reich, from the time he first came to the United States in 1906 until his last appearance at the trial. I take it he realizes

that Germany cannot win. He would like to retain American citizenship for the benefit such will be to him.

From the evidence, which I deem extremely clear, cogent and convincing, I find the allegations of the complaint are true. My decision necessarily is that defendant is not entitled to and cannot retain American citizenship.

Presentation, after notice, of findings, conclusions and decree in accord with this opinion is requested.