**UNITED STATES of America**
v.
**Frank COSTELLO, Defendant.**

United States District Court
S. D. New York.
Feb. 20, 1959.

Arthur H. Christy, U. S. Atty., for S. D. New York, New York City, for the United States. Morton S. Robson, John A. Guzzetta, Asst. U. S. Attys., New York City, of counsel.

Hays, St. John, Abramson & Heilbron, New York City, for defendant. Edward Bennett Williams, Washington, D. C., of counsel.

DAWSON, District Judge.

This is an action brought by the United States of America pursuant to the provisions of Title 8 U.S.C.A. § 1451 (a) [1] to revoke and set aside an order of this court entered September 10, 1925 admitting the defendant Frank Costello to United States citizenship, and to cancel a certificate of naturalization issued to this defendant, on the ground that said order and certificate of naturalization were procured by the concealment of material facts and by willful misrepresentation.

The past history of this action bears mention. On October 22, 1952 the Government instituted denaturalization proceedings against this defendant under § 338(a) of the Nationality Act of 1940, 54 Stat. 1158, § 738 of old Title 8, U.S. C.A. That action came on for trial before Judge Palmieri of this court in 1956. Defendant's counsel moved to dismiss the action on the ground that both the affidavit of good cause and the Government's evidence were tainted by wiretapping. This contention was sustained by the court and the action was dismissed without prejudice to renew and upon certain conditions. United States

**1.** 66 Stat. 260, 8 U.S.C.A. § 1451(a) reads in pertinent part:

"It shall be the duty of the United States attorneys for the respective districts, upon affidavit showing good cause therefor, to institute proceedings * * * for the purpose of revoking and setting aside the order admitting such person to citizenship and cancelling the certificate of naturalization on the ground that such order and certificate of naturalization were procured by concealment of a material fact or by willful misrepresentation * * *."

v. Costello, D.C.S.D.N.Y.1956, 145 F. Supp. 892.

This judgment was subsequently reversed by the United States Court of Appeals for this circuit on the ground that even if the Government's affidavit of good cause was invalid as the fruit of illegal interceptions, the Government should have been permitted to file a new affidavit rather than have the case dismissed. United States v. Costello, 2 Cir., 1957, 247 F.2d 384. The Supreme Court granted certiorari and reversed the Court of Appeals on the ground that the affidavit of good cause should have been filed contemporaneously with the complaint; it ordered that the complaint be dismissed. Costello v. United States, 1958, 356 U.S. 256, 78 S.Ct. 714, 2 L.Ed. 2d 741. The Government, on May 1, 1958, instituted this action. It is brought under the provisions of § 340(a) of the Immigration and Nationality Act of 1952,[2] and an affidavit of good cause was filed contemporaneously with the complaint.

The basic facts underlying this action are not in dispute. Frank Costello was, prior to September 10, 1925, a citizen of Italy. On May 1, 1925 he filed a petition for naturalization in the United States District Court for the Southern District of New York. On September 10, 1925 he was admitted to citizenship and Certificate of Naturalization No. 2136470 was issued to him on that date. The Government contends that in more recent years facts have been discovered which indicate that Costello obtained his citizenship by the concealment of material facts and by willful misrepresentation. Thus, this action was instituted.

The factual issue to be determined by this Court can be simply stated. It is whether or not the defendant did in fact obtain his citizenship by the concealment of material facts or by willful misrepresentation. If this question is answered in the affirmative, this Court must then examine the several important further legal questions propounded by the defense.

At the conclusion of the Government's case the defendant's attorney indicated that he would not present any witnesses in this action. The defendant moved to dismiss the complaint, resting upon the Government's presentation of evidence and the legal issues which he felt militated in his favor.

Before turning to the findings of fact and conclusions of law, a short review of the law of denaturalization is in order. Naturalization is one of the powers expressly granted by the states to the Federal Government. The Constitution, Article I, Section 8, Clause 4, provides that "The Congress shall have Power * * * To establish an uniform Rule of Naturalization." Congress has from time to time exercised that power, established the rule and declared the manner of and the conditions under which an alien may be naturalized to become a citizen of the United States. Pursuant to this authority the first uniform rule of naturalization established by Congress was the Act of March 26, 1790. This basic act has been changed from time to time but it was not until the Naturalization Act of June 29, 1906 that the Act granted for the first time the authority to denaturalize. Section 15 of the 1906 Act directed United States district attorneys, upon affidavit showing good cause, to institute proceedings for the purpose of setting aside and cancelling the certificate of citizenship on the ground of fraud or on the ground that such certificate of citizenship was illegally procured.

It was early settled by the Supreme Court that it was constitutional to sue to revoke a judgment of naturalization for fraud or illegality, Johannessen v. United States, 1912, 225 U.S. 227, 32 S.Ct. 613, 56 L.Ed. 1066, and it was also permissible for the Government both to

---

2. The Nationality Act of 1940 was superseded on December 24, 1952 by the Immigration and Nationality Act of 1952, commonly referred to as the McCarran Act, June 27, 1952, c. 477, Title III, Chap. 2, § 340, 66 Stat. 260, 8 U.S.C.A. § 1451.

protest the naturalization proceeding and, upon losing, bring suit to revoke a judgment. United States v. Ginsberg, 1917, 243 U.S. 472, 37 S.Ct. 422, 61 L.Ed. 853.

The 1906 Act remained basically unchanged with regard to denaturalization until the passage of the Nationality Act of October 14, 1940. This Act codified the Nationality and Naturalization laws of the United States, repealing generally all previous laws of this nature. The Act went into effect January 13, 1941, and § 15 of the 1906 Act was re-renewed as § 338(a)(b)(c)(d)(f) and (g) of the 1940 Nationality Act.

The next important change was the enactment of the Immigration and Nationality Act of 1952, which superseded the prior Act of 1940. The Act of 1940 had provided that the order admitting a person to citizenship might be revoked and set aside and the certificate of naturalization cancelled *"on the ground of fraud or on the ground that such order and certificate of naturalization were illegally procured."* Section 340(a) of the 1952 Act changed the grounds to read: *"on the ground that such order and certificate of naturalization were procured by concealment of a material fact or by willful misrepresentation."*

█ Thus, the basic difference between the denaturalization provisions of the new Act of 1952 and those of the prior Act of 1940 is that the prior Act provides as the ground for the bringing of a denaturalization action "fraud" or "illegal procurement." The new Act eliminates the second ground and provides for denaturalization only on the ground of "concealment of a material fact" or "willful misrepresentation." It has never been fully resolved as to whether or not the elimination of the ground of illegal procurement and the inclusion of the ground of concealment of a material fact makes the 1952 Act more stringent or less stringent. If the Government proceeds on the allegation of "fraud" it must introduce evidence that is "clear, unequivocal and convincing" and which does not leave "the issue in doubt" that the defendant has been guilty of fraud. Maisenberg v. United States, 1958, 356 U.S. 670, 78 S.Ct. 960, 962, 2 L.Ed.2d 1056; Schneiderman v. United States, 1943, 320 U.S. 118, 158, 63 S.Ct. 1333, 87 L.Ed. 1796; Klapprott v. United States, 1949, 335 U.S. 601, 612, 69 S.Ct. 384, 93 L.Ed. 266; Baumgartner v. United States, 1944, 322 U.S. 665, 64 S.Ct. 1240, 88 L.Ed. 1525; United States v. Anastasio, 3 Cir., 1955, 226 F.2d 912.

█ This burden of the Government to establish clearly and convincingly its evidence is rightly based upon the concept that nowhere in the world today is the right of citizenship of greater worth to an individual than it is in this country. Schneiderman v. United States, 1943, 320 U.S. 118, 122, 63 S.Ct. 1333, 87 L.Ed. 1796; United States v. Meli, D.C.E.D.Mich.1957, 158 F.Supp. 217. We are ever cognizant that denaturalization, like deportation, may result in the loss of all that makes life worth living. Knauer v. United States, 1946, 328 U.S. 654, 659, 66 S.Ct. 1304, 90 L.Ed. 1500. These truths led the courts to lay down the rule that "the facts and the law should be construed as far as is reasonably possible in favor of the citizen." Schneiderman v. United States, 1943, 320 U.S. 118, 63 S.Ct. 1333, 1335, 87 L.Ed. 1796; United States v. Anastasio, 3 Cir., 1955, 226 F.2d 912; United States v. Meli, D.C.E.D.Mich. 1957, 158 F.Supp. 217. There can be no dispute that our jurisprudence requires a solidity of proof which leaves no troubling doubt when a court decides a question of such gravity as is implied in an attempt to reduce a person from the status of citizen to that of alien. Baumgartner v. United States, 1944, 322 U.S. 665, 670, 64 S.Ct. 1240, 88 L.Ed. 1525; United States v. Anastasio, 3 Cir., 1955, 226 F.2d 912.

Thus, viewing the development of the law and the heavy burden and great responsibility imposed upon the Government in enforcing the denaturalization aspect of our laws, this Court has given exceedingly careful consideration and

weight to every allegation and defense. The contentions of the Government, plus the burden of evidence and the findings of fact are discussed seriatim below.

The Government contends that the naturalization order and certificate were procured by willful misrepresentation or concealment of material facts in seven respects which are itemized in the complaint. The Court finds that two of the allegations have been established as constituting willful misrepresentation and fraud.

1. That the defendant stated that his occupation was "real estate" whereas his true occupation was bootlegging.

2. That the defendant swore in his oath of allegiance to the United States, on September 10, 1925, that "I will support and defend the Constitution and laws of the United States against all enemies, foreign and domestic; and that I will bear true faith and allegiance to the same;" whereas at the time the defendant was actually engaged in a course of activity which flouted the Constitution of the United States and was designed to violate the laws of the United States.

On the same day that Costello took this oath of allegiance, Judge Thacher, a judge of this court, in consideration of the petition executed by Costello, and, having found that defendant had taken the oath required by law, admitted the defendant to United States citizenship. Can there be any doubt that, if Judge Thacher had known at that time that the occupation of the defendant, at that time, was not "real estate" but "bootlegging," and that far from defending the laws of the United States the defendant was engaged in a series of extensive activities designed to flout those laws, he would have refused to admit Costello to citizenship? Lest there be any doubt on the subject, we must keep in mind that Judge Thacher himself decided, the following year, that one who deliberately violated the Eighteenth Amendment to the Constitution "cannot be said to be attached to the principles declared by that amendment," and denaturalized an alien who during the preceding five years had been convicted of violation of the prohibition laws. United States v. Mirsky, D.C.N.Y.1926, 17 F.2d 275.

The question as to whether the answers given by the defendant and the oath taken by him were false might be more difficult to determine if it were not that defendant himself has admitted the facts in sworn testimony given by him in various legal interrogations in more recent times.

Thus, in a statement given to Special Agent James N. Sullivan of the Intelligence Unit on July 24, 1938, the defendant Costello was asked the following questions and gave the following answers:

"Q. Did you have anything to do with the liquor business during the Prohibition era—that is, say, from 1920 to 1933? A. Yes.

"Q. During what period of time? A. Oh, until about—I will say from 1923 or 1924 until a year or two before repeal."

Costello was questioned by District Attorney Hogan before a New York County Grand Jury in 1943 in connection with an investigation into judicial nominations in New York County. He admitted that he had "got large sums of money" from bringing in whisky during prohibition. He was asked the following questions and gave the following answers:

"Q. That is true, you were in the bootlegging business, weren't you? A. Yes.

"Q. And you did smuggle whisky into the country? A. Yes."

He admitted that he had reported to the State Tax authorities that for the years 1919 to 1932 his income totalled $305,000, and that most of it was made in the bootlegging business.

He was then asked about his interest in real estate, and gave the following answers:

"Q. Did you have any other occupation in those years? A. Well,

I was doing a little real estate at that time.

"Q. Did you ever make any money in real estate? A. Well, made some moneys, yes.

"Q. Not very much was it? Do you recall any particular real estate transaction in which you made any money? A. Well, I had bought a building on West End Avenue and 92nd Street.

"Q. Yes. A. And I believe I made a little money there.

"Q. How much would you say? A. Well, I would say maybe $25,-000.

"Q. On the sale of that building? A. Yes.

"Q. Did you take it in your name or in the name of a corporation? A. Well, I think it was a corporation at the time.

"Q. Do you remember the name of it? A. I think it was Koslo.

"Q. You contend on the sale of that property you profited to the extent of $25,000? A. I think so, about twenty or twenty-five thousand dollars. I just don't remember so far back.

"Q. How much did you pay for the property? A. I think we paid about $125,000, I believe.

"Q. Who was associated with you in the purchase of it? A. I can't think of his name right now.

"Q. How much of the $125,000 was yours? A. I had 50 per cent of it.

"Q. So that would be $62,500? A. Yes. I think we put up about thirty and then we sold it before we even closed.

"Q. Whatever you put up was proceeds of the liquor business, isn't that right? A. It might have been gambling or liquor.

"Q. Gambling and liquor? A. I can't distinguish money from the liquor."

Furthermore, Costello gave testimony before a Referee appointed by the Appellate Division of the New York Supreme Court in a matter relating to the election of a Supreme Court Justice in New York, during which he was asked the following questions and gave the following answers:

"Q. You were in the bootlegging business, weren't you? A. I was.

"Q. You smuggled whisky into the country? A. Yes.

"Q. And your income was pretty heavy in those years, wasn't it? A. Well, it was profitable."

The Government also presented the testimony of certain individuals who had been associated with the bootlegging activities of Costello during 1925 and prior thereto. One witness, Emanuel Kessler, testified as to how, after the passage of the Eighteenth Amendment, he went into the bootlegging business. He acquired a half dozen boats, including an ocean-going vessel, which transported whisky from Europe to a location off the end of Long Island where the whisky was landed at night by means of the smaller boats. He entered into an arrangement with Costello and his brother to transport the illicit, smuggled merchandise from the end of Long Island to Astoria in New York City and there store it in premises owned and occupied by the Costellos. Kessler advanced the money to Costello to buy the trucks to transport this smuggled liquor. On an average, 6,000 cases of whisky were so transported every week, which Kessler thereafter sold at about $50 a case. He testified that he was doing a business amounting to fifteen million dollars a year. Thereafter Kessler was convicted of violating the prohibition laws and served a two-year prison term. In 1928 he was indicted for income tax evasion.

The Government had other witnesses who testified as of their personal knowledge to Costello's participation in bootlegging activities during this period. If the Government rested on the testimony of the individual witnesses it might be necessary to appraise their evi-

dence more carefully, but in view of the fact that the defendant has frankly admitted, on a number of occasions, that in the period around 1925 and prior thereto he was engaged in bootlegging, the testimony of the individual witnesses is, if anything, merely cumulative.

■ What then is the evidence as to Costello's participation in the "real estate" business during this period? A check of the real estate records from 1921 to 1925 in New York, Bronx, Kings and Queens Counties shows that there was only one real estate transfer in which he participated in his individual name. He was, however, a principal in a concern known as Koslo Realty Corporation, which was formed on December 1, 1924 and which, on the same date, purchased a parcel of real estate on West End Avenue in New York City and sold it the following June 22nd. Thereafter, and after Costello had been naturalized, Koslo Realty Corporation engaged in three other real estate transactions. Thus we have the situation, so far as the records indicate, that prior to the time that Costello had sworn that his occupation was "real estate" he personally had engaged in only one real estate transfer in his own name; and the corporation in which he was a principal engaged in only one transaction and that to the extent of purchasing one parcel of real estate. During the same period, as the evidence shows and as Costello has admitted, he was actively engaged in bootlegging on a large scale and with very profitable results. If a man in that situation had been honest when asked what his occupation was, would he have answered "real estate?" If he had told the truth he probably would not have been naturalized, but this is no excuse for his using fraud and deceit to secure his naturalization. The term "occupation" would commonly be understood to refer to the income producing activity to which a person devotes the major portion of his time and from which he derives the major portion of his income. Defense counsel seems to urge that when the Government asked

for the "occupation" of the applicant for citizenship it was asking him to state his "legal occupation." This is a far-fetched hypothesis. Obviously if he were engaged in an illegal occupation the Government would like to know that to determine whether he properly should be admitted to citizenship. Costello, confronted with the question and the fact that his occupation was an illegal one, had one of two choices in giving his answer. If he had told the truth he would have said that his occupation was bootlegging; his application for citizenship would then have been denied. When he answered that his occupation was real estate he was giving a false and misleading answer and was therefore engaging in a willful misrepresentation in order to secure his naturalization certificate.

The Court finds:

1. That commencing several years prior to May 1, 1925 and during the period from May 1, 1925 to September 10, 1925, and for several years thereafter, Costello was actively and extensively engaged in the occupation of smuggling, trucking, storing, purchasing and dealing in alcoholic beverages in violation of the law.

2. The real occupation of Costello at the time that he applied for naturalization and was admitted to naturalization was not "real estate" but was bootlegging.

3. That when Costello answered the question on the application for citizenship by stating that his occupation was "real estate" he was making a fraudulent statement and a willful misrepresentation in order to secure naturalization.

4. That when defendant in his petition for naturalization and in his oath of naturalization swore that he was attached to and would support the Constitution and laws of the United States, he was engaged in extensive activities in violation of the laws of the United States and contrary to the Constitution of the United States, and that the answers which he gave on his petition for natu-

ralization, and his statement in his oath of naturalization, were false, fraudulent and misleading.

The Court concludes that Costello secured his naturalization by concealment of material facts and by willful misrepresentation. An application to become a United States citizen is a serious matter and is entitled to be treated with more respect than an application to join the corner pinochle club. An oath of allegiance to the United States is an oath to support the Constitution and laws of the United States, and is, and should be, a solemn obligation. It would be a sad day for the Republic if such an oath could be taken with fingers crossed and tongue-in-cheek, as apparently was done by Costello. The willful misrepresentations and active concealment in which Costello engaged were of a nature which would warrant an order directing his denaturalization.

The Government has urged various other grounds for denaturalization, including other alleged misrepresentations and fraudulent concealment. The Court is not convinced that they have been established by that requisite degree of proof needed in an action of this nature, but in view of the conclusion of the Court, hereinabove stated, there would seem to be no necessity to analyze them with respect thereto in any detail.

At the time of Costello's naturalization the fourth subsection in Section 4 of the 1906 Act provided:

"It shall be made to appear to the satisfaction of the court admitting any alien to citizenship that immediately preceding the date of his application he resided continuously within the United States five years at least, and within the State or Territory where such court is at the time held one year at least, and that during that time he has behaved as a man of good moral character, attached to the principles of the Constitution of the United States, and well disposed to the good order and happiness of the same. * * *"

The courts have held that violations of the prohibition liquor laws, whether national or state, should be taken into consideration in determining questions respecting the good moral character of applicants for citizenship and their attachment to the principles of the Constitution of the United States. United States v. De Francis, 1931, 60 App.D.C. 207, 50 F.2d 497; Ex parte Elson, D.C.W.D.Tex.1924, 299 F. 352; In re Bonner, D.C.D.Mont.1922, 279 F. 789.

The oath an applicant for citizenship takes when admitted is not only one of renunciation of allegiance and fidelity to the sovereignty of his former citizenship, but the applicant also pledges himself to support and defend the Constitution and laws of the United States against all enemies, foreign and domestic and to bear true faith and allegiance to the same.

This court, in United States v. Mirsky, D.C.S.D.N.Y.1926, 17 F.2d 275, had before it an alien who during the period of five years before he had been admitted to citizenship had been convicted of violating the Eighteenth Amendment. This court granted the decree of cancellation of the certificate of naturalization holding,

"The statute requires, as a prerequisite to naturalization, that it shall be made to appear that during the probationary period of five years immediately preceding the application the alien 'has behaved as a man of good moral character, attached to the principles of the Constitution of the United States' * * * One who deliberately violates the Eighteenth Amendment to the Constitution cannot be said to be attached to the principle declared by that amendment. In re Nagy (D.C.) 3 F.2d 77; In re Raio (D.C.) 3 F.2d 78; In re Phillips (D.C.) 3 F.2d 79; Ex parte Elson, (D.C.) 299 F. 352; In re Bonner (D.C.) 279 F. 789 * * *

"Neither the fact that in this and in other communities there are

many citizens who are not attached in thought or deed to the principle embodied in the Constitution by the Eighteenth Amendment, nor the fact that opposition to that principle with a view to removing it from the Constitution is quite generally thought to be the part of good citizenship, can relieve this court of its duty to apply the law as it is now written.

"Motion for judgment is granted. * * * "

The Eighth Circuit had before it in Turlej v. United States, 1929, 31 F.2d 696, 699, the review of a lower court order cancelling a certificate of naturalization for fraud on the ground that before the certificate was granted the applicant had violated the liquor laws. The Eighth Circuit in upholding the cancellation discussed the fact that the violation of the Eighteenth Amendment clearly demonstrated that the applicant could not be a man of good moral character attached to the principles of the Constitution. The court said:

"* * * It is an act of Congress to administer the new principle of the federal Constitution, prohibition. All this is new and known of all men. Hence violation of it is consciously and deliberately in subversion of the principles of the Constitution, and to which it must be proven the applicant is attached, before admitting him to citizenship. * * * It is not enough to be attached to some of the principles of the Constitution. There must be proof of attachment to all of them, including that of prohibition. Violating this law breeds disorder and unhappiness, and in circumstances here indicates the offender is not 'well disposed to the good order and happiness' of nation and people."

In United States v. De Francis, 1931, 60 App.D.C. 207, 50 F.2d 497, 498, the Court of Appeals reversed the lower court's dismissal of a petition for cancellation and indicated that one who violated the National Prohibition Act, 27 U.S.C.A. § 4 et seq., could not be attached to the principles of the Constitution. The court stated that in order for an alien to avail himself of the privilege of citizenship he must comply with the laws requiring good moral character.

The court indicated that had the naturalization court known of the violations of the prohibition laws the applicant would not have been admitted to citizenship.

The court stated:

"Any person who violates the provisions of the Prohibition Act violates the principles of the Constitution of the United States, and cannot be held to be attached to the principles of the Constitution of the United States. Nor can it be said that such a person possesses good moral character. Evidence showing the lack of good moral character is ground for cancellation of a certificate. United States v. Mirsky (D.C.) 17 F.2d 275; Turlej v. United States, 8 Cir., 31 F.2d 696, 699; United States v. Leles (D.C.) 236 F. 784; United States v. Raverat (D.C.) 222 F. 1018; United States v. Wexler (D.C.) 8 F.2d 880; United States v. Unger (D.C.) 26 F.2d 114."

In United States v. Villaneuva, D.C. Nev.1936, 17 F.Supp. 485, 487, the plaintiff's complaint asked that the decree of a certificate of naturalization issued to the defendant be set aside and cancelled in that the naturalization was fraudulently procured since when his petition was filed and granted he was not attached to the principles of the Constitution and did not intend to support the laws of the United States. The Government alleged that both before and after the naturalization the defendant had been involved in the violation of the National Prohibition Act. The court granted an order setting aside the certificate of naturalization, stating,

"Courts have quite universally held that violations of prohibition

liquor laws, whether national or state, should be taken into consider-.ation in determining questions respecting the good moral character of applicants for citizenship and their attachment to the principles of the Constitution of the United States. Title 8 U.S.C.A. § 382; United States v. De Francis, 60 App. D.C. 207, 50 F.2d 497; United States v. Mirsky, D.C., 17 F.2d 275, 276; Ex parte Elson, D.C., 299 F. 352; In re Raio, D.C., 3 F.2d 78; In re Bonner, D.C., 279 F. 789; In re Trum, D.C., 199 F. 361; United States v. Leles, D.C., 236 F. 784; United States v. Gerstein, 284 Ill. 174, 119 N.E. 922, 1 A.L.R. 318."

With reference to the fact that the litigation occurred after the prohibition amendment had been repealed, the court brushed aside the contention that it could not act because of the repeal, stating,

"* * * The fact that the Eighteenth Amendment has been eliminated, the National Prohibition Act repealed, and thus the particular offenses of which the defendant was adjudged guilty are no longer offenses against the Constitution and laws of the United States, does not present a substantial reason why the case of defendant in this proceeding should now be regarded in the light of existing laws rather than the law as existing at the time of his admission, and for a time both prior and subsequent thereto.

"It is therefore the conclusion of the court that defendant's certificate of naturalization should be set aside * * *."

The findings of fact indicate that the defendant was engaged in violating the Eighteenth Amendment and laws passed pursuant thereto within five years of his naturalization and at the time of his naturalization. The Court concludes that Costello's willful misrepresentation and concealment of material facts, as noted above, and his false oath of allegiance, constituted a fraud upon this court and merit the cancellation of the naturalization decree.

It is now necessary to consider other points raised by defendant's able and astute counsel. Defendant contends that the repeal of the Eighteenth Amendment and of the National Prohibition Laws constitute a bar to a consideration of violations of those provisions when they were in effect, urging that since the Twenty-first Amendment took effect on December 5, 1933 it is settled that no action, civil or criminal, can be maintained which has for its basis violation of the National Prohibition Laws. It should perhaps be pointed out that the basis of the present decision is not that Costello violated the National Prohibition Laws; the basis of the decision is the false representation made by Costello as to his attachment to the principles of the United States Constitution and the laws of the United States.

The Eighteenth Amendment and the National Prohibition Act were in effect in 1925 and the years immediately prior thereto. It was Costello's flagrant and contemptuous disregard of the laws and the provisions of the Constitution which cast doubt on Costello's veracity when he swore his allegiance to the Constitution and pledged himself to uphold the laws of the United States. He must have been referring to the Constitution and to the laws as they were at the time he took his oath. His conduct showed that in making the declaration in the required oath he was making a fraudulent statement; and the later repeal of the prohibition laws cannot erase his fraudulent conduct as it existed at the time he was naturalized. See United States v. Villaneuva, supra.

Defendant's counsel further contends that the dismissal of the prior denaturalization proceeding is a bar to this action. That action was dismissed by the Supreme Court on the ground that "an affidavit showing good cause is a prerequisite to the initiation of denaturalization proceedings. The affidavit must be filed with the complaint

when the proceedings are instituted." 356 U.S. at page 257, 78 S.Ct. at page 714, 2 L.Ed.2d 741. Defendant's counsel urges that under Rule 41(b) of the Rules of Civil Procedure, 28 U.S.C.A., this dismissal operates as a final adjudication and constitutes a bar to further proceedings to denaturalize the defendant. The Court cannot agree with this contention. The rule provides that a dismissal, "other than a dismissal for lack of jurisdiction or improper venue" operates as an adjudication on the merits. The most that can be drawn from the decision is that the Supreme Court, in directing the dismissal of the first proceeding, was stating that unless an affidavit of good cause is filed with the complaint the United States Attorney has no jurisdiction to proceed with the denaturalization proceedings. It was dismissing the action for failure to comply with what it deemed to be a jurisdictional requirement. It was not determining the action on the merits, nor did it purport to dismiss the action on the merits. The dismissal decree did not operate as res judicata so far as the present action is concerned, where the proper affidavit was timely filed and where different grounds of relief were urged by the plaintiff.

Defendant's attorney has also raised the issue of *res judicata*, predicating this defense on the premise that the order of naturalization of September 10, 1925 constituted a valid judgment between the parties determining the issues presented by this action.

 It is well established that the doctrine of *res judicata* cannot be asserted against the Government so as to bar or preclude it from instituting and maintaining a statutory proceeding to set aside and cancel a certificate of citizenship on the ground of fraud. Every certificate of citizenship must be treated as granted on condition that the Government may challenge it in a separate proceeding as required by statute and demand its cancellation, unless it was issued in accordance with statutory requirements. Knauer v. United States,

1946, 328 U.S. 654, 66 S.Ct. 1304, 90 L. Ed. 1500; Maney v. United States, 1928, 278 U.S. 17, 49 S.Ct. 15, 73 L.Ed. 156; United States v. Ascher, 2 Cir., 1945, 147 F.2d 544; United States v. Gokhale, 2 Cir., 1928, 26 F.2d 360; United States v. Javier, 1927, 57 App.D.C. 303, 22 F.2d 879; United States v. Ali, D.C.E.D.Mich. 1927, 20 F.2d 998; United States v. Jerome, D.C.S.D.N.Y.1953, 115 F.Supp. 818; United States v. Lustig, D.C.S.D.N.Y. 1953, 110 F.Supp. 806; United States v. Gallucci, D.C.D.Mass.1944, 54 F.Supp. 964; United States v. Marini, D.C.S.D. N.Y.1936, 16 F.Supp. 963; 3 C.J.S. Aliens § 154 (Pocket Part).

In United States v. Parisi, D.C.D.Md. 1938, 24 F.Supp. 414, 420, an action to cancel defendant's certificate of citizenship, the defense contended that *res judicata* as a doctrine applied to the action. The court rejected this contention stating:

"* * * Nor is there any doubt now, after recent decisions of the Supreme Court, that the certificate of citizenship based on the naturalization order may be directly attacked by the Government under the special procedure provided for in 8 U.S.C.A. § 405 taken in this case. Naturalization procedure is judicial in character and is not subject to collateral attack; but is not *res adjudicata* to the extent that it is immune from direct attack in this special proceeding authorized by Congress. Johannessen v. United States, 225 U.S. 227, 32 S.Ct. 613, 56 L.Ed. 1066; United States v. Ness, 245 U.S. 319, 38 S.Ct. 118, 62 L.Ed. 321; United States v. Unger, D.C., 26 F.2d 114; United States v. Javier, 57 App.D.C. 303, 22 F.2d 879. * * *"

In United States v. Unger, D.C.S.D. N.Y.1928, 26 F.2d 114, 116, likewise an action to cancel and set aside a decree of citizenship, the court rejected the defense of *res judicata* stating:

"A decree of the state court or of the United States District Court

granting citizenship is not res adjudicata, nor is the United States estopped by such decree, although it entered its appearance in the proceeding and unsuccessfully raised the same question. The proceeding under section 15, which provides for a suit in equity being brought by the district attorney to cancel a certificate of naturalization, is not in a strict sense an appeal, but is in the nature of an added or cumulative remedy for correcting an error in the original proceeding. United States v. Ness, 245 U.S. 319, 38 S.Ct. 118, 62 L.Ed. 321; United States v. Ginsberg, supra; Tutun v. United States, 270 U.S. 568, 46 S.Ct. 425, 70 L.Ed. 738; Johannessen v. United States, 225 U.S. 227, 32 S.Ct. 613, 56 L.Ed. 1066."

■ For these reasons the defense of *res judicata* is not valid.

■ The defendant also contends that because of the period of time which has elapsed between the granting of the certificate of naturalization and the date of this action, the Government is guilty of laches and is estopped from bringing this action. The United States Supreme Court in United States v. Summerlin, 1940, 310 U.S. 414, 416, 60 S.Ct. 1019, 1020, 84 L.Ed. 1283, has clearly and concisely set the rule when it said,

"It is well settled that the United States is not bound by state statutes of limitation or subject to the defense of laches in enforcing its rights. United States v. Thompson, 98 U.S. 486, 25 L.Ed. 194; United States v. Nashville, C. & St. L. R. Co., 118 U.S. 120, 125, 126, 6 S.Ct. 1006, 30 L.Ed. 81; Stanley v. Schwalby, 147 U.S. 508, 514, 515, 13 S.Ct. 418, 420, 421, 37 L.Ed. 259; Guaranty Trust Co. of New York v. United States, 304 U.S. 126, 132, 58 S.Ct. 785, 788, 82 L.Ed. 1224; Board of Commissioners of Jackson County v. United States, 308 U.S. 343, 351, 60 S.Ct. 285, 288, 84 L. Ed. 313."

■ Laches, or lapse of time, cannot be pleaded against the Government in proceedings to cancel a certificate of naturalization. United States v. Orth, D.C., 51 F.Supp. 682, reversed on other grounds 4 Cir., 1944, 142 F.2d 969; United States v. Marino, D.C.S.D.N.Y. 1939, 27 F.Supp. 155, 156; United States v. Spohrer, C.C.D.N.J.1910, 175 F. 440, 448; 3 C.J.S. Aliens § 157 (Pocket Part); Cable, Loss of Citizenship, Denaturalization, p. 60.

■ The test is not the length of time between naturalization and filing the proceeding to cancel; the test is whether the certificate in its inception was fraudulently procured. If so, an action to cancel may be filed any time after naturalization. It has been held that the defense of laches was not available in a proceeding by the Government to cancel a certificate of citizenship. United States v. Schneiderman, D.C., 33 F.Supp. 510, affirmed 9 Cir., 119 F.2d 500, reversed and vacated on other grounds 1943, 320 U.S. 118, 63 S.Ct. 1333, 87 L.Ed. 1796. There are instances of cancellation of certificates of naturalization after a period as great as thirty-five years. United States v. Wursterbarth, D.C.D.N.J.1918, 249 F. 908.

In United States v. Reinsch, D.C.W.D. Wash., 50 F.Supp. 971, 972, reversed on other grounds 9 Cir., 1945, 156 F.2d 678, an action to cancel the naturalization of the defendant, the lower court held that though thirty-one years had elapsed since the defendant was admitted to citizenship, this lapse of time did not bar a proceeding to denaturalize him. The court stated:

"That the lapse of time does not bar the government in this type of proceeding has been established by a number of cases. See United States v. Wursterbarth, D.C.N.J., 249 F. 908; United States v. Darmer, D.C.Wash., 249 F. 989; Schurmann v. United States, 9 Cir., 264 F. 917, 18 A.L.R. 1182; United States

v. Herberger, D.C.Wash., 272 F. 278."

In United States v. Ali, D.C.E.D.Mich. 1925, 7 F.2d 728, 730, an action for the cancellation of a certificate of citizenship, defendant maintained that laches was a defense. In this denaturalization action the court stated:

"The contention of the defendant that the right of the government to maintain this suit is barred by lapse of time is equally without merit. It is not, and cannot be, claimed that there is any applicable statute of limitation; and it is elementary that the doctrine of laches does not apply as against the government, when suing in its capacity as a sovereign and asserting governmental rights. Chesapeake & Delaware Canal Co. v. United States, 250 U.S. 123, 39 S.Ct. 407, 63 L.Ed. 889."

In United States v. Cufari, D.C.D. Mass., 120 F.Supp. 941, 943, vacated on other grounds 1 Cir., 1954, 217 F.2d 404, the lower court, per Wyzanski, J., had before it the defendant's contention that laches applied in a denaturalization action. The court dismissed this defense, stating:

"If laches were relevant in a proceeding of this nature, brought by the United States, the burden of proving it would be upon the defendant. Neither from him nor from any other source does it appear when the United States learned of this fraud, nor whether it moved expeditiously thereafter. So there is no factual foundation for the plea of laches. Moreover, there is no legal foundation. The Brenci case [Brenci v. United States, 1 Cir., 175 F.2d 90] (where a delay of two decades occurred) shows that laches is not a defense in this type of proceeding brought by the sovereign."

■ It therefore appears that the defense of laches cannot be sustained.

Finally defendant's counsel contends that evidence in this case is tainted by wiretapping and cannot be considered by this Court. It should be pointed out, at the outset, that no wiretaps have been used in evidence in this case nor would they have been admitted if offered. What defendant urges, in essence, is that the Government learned of Costello's bootlegging activities by means of wiretaps and that statements made by Costello before investigating authorities, to which reference has been made, were the result of inquiries started as a consequence of wiretapping.

There can be no doubt that, from time to time and over a period of years, law enforcing agencies did tap Costello's telephone wires and probably illegally, in view of the decision in Benanti v. United States, 1957, 355 U.S. 96, 78 S.Ct. 155, 2 L.Ed.2d 126. The extent to which the Benanti decision goes is still not clear. See, Brown & Peer, "The Wiretapping Entanglement: How to Strengthen Law Enforcement and Preserve Privacy," 44 Cornell L.Q. 175, 181 (1959).

■ However, not even Costello's ingeniously alert counsel went so far as to contend that the fact that Costello's wires had been tapped gave him immunity for past illegal activities. Therefore, a determination of his objections to the evidence which was offered must be considered in the light of the particular evidence. In each case we must examine the record to see if wiretap evidence was presented, or if the evidence was obtained indirectly as a result of illegal wiretaps. See Nardone v. United States, 1937, 302 U.S. 379, 58 S.Ct. 275, 82 L.Ed. 314 and 1939, 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307. No wiretaps were introduced in evidence in the present proceeding.

The most that can be contended is (1) that the Government learned of Costello's participation in bootlegging by tapping wires at his place of business in the period preceding 1925; and (2) that the interrogation of Costello by the New York City Grand Jury was precipitated by information obtained by District At-

torney Hogan as a result of wiretaps on Costello's home telephone.

So far as the early wiretapping is concerned the testimony showed that in the period prior to 1925 the United States Attorney in New York was conducting an investigation of bootlegging activities of a number of persons, including Costello, and that in the course of the investigation certain telephones leading to 405 Lexington Avenue, where Costello had an office, were tapped. The Assistant United States Attorneys in charge of the investigation were: John M. Harlan, now a Justice of the United States Supreme Court; William E. Stevenson, now President of Oberlin College and Herman Stichman, now Trustee of the Hudson & Manhattan Railroad Company. Mr. Stichman and Mr. Stevenson both testified in the trial before me. Their testimony was clear and uncontradicted, and accepted as true by the Court, that the Government's information as to the bootlegging activities of Costello was not derived from telephone conversations but was derived from statements of certain individuals acquainted with the defendant's activities. The wiretapping was done to get other information but apparently produced no real results. Thereafter Costello was indicted and tried for violation of the prohibition laws. That trial resulted in a hung jury and the indictment was later nolle prossed. It cannot be concluded that the evidence on which the Government brought the present denaturalization proceeding was the fruit of the tap on Costello's wires in those early days.

So far as the relationship of wiretapping to the statements made by Costello before the New York Grand Jury is concerned, the facts are clear. It appears that Mr. Hogan, the District Attorney of New York County, in connection with his law enforcing activities, secured an order in accordance with New York State law permitting him to tap the home telephone of Costello in 1943. In the course of the tapping of this telephone a conversation was intercepted between Costello and one Thomas Aurelio, who had just received a bi-partisan nomination for the New York Supreme Court in which Aurelio thanked Costello for his assistance in getting him the nomination. The District Attorney instituted a Grand Jury investigation as to the circumstances of the nomination, which later led to an investigation of this Aurelio incident before a Referee appointed by the Appellate Division of the Supreme Court. While it was the intercepted telephone conversation between Costello and Aurelio which precipitated these investigations, this intercepted conversation had no relationship to any bootlegging activities of Costello. The only wiretaps used by the District Attorney covered a period beginning late in 1942 and extending into 1943. When the District Attorney had Costello before the Grand Jury he questioned the defendant about his activities during the years 1920 to 1930 because, as he said, "I wanted to present to the Grand Jury as much as I could with reference to his background * * * I thought the Grand Jury was entitled to know as much as I could present to it about the witness in order to make a judgment with respect to his testimony."

The proposition of the defendant seems to be that because the investigation was precipitated by an intercepted telephone conversation on a purely collateral matter, nothing he said about his criminal activities in other fields could thereafter be used. This would extend the principle of the second Nardone case far beyond what the Court determined. It would mean that a man whose telephone had been tapped would be granted immunity for any admissions which he thereafter made, not in the telehpone conversations but in answer to any questions in a later investigation. There is no basis for extending the rule to this degree.

The evidence received in this case was not wiretap evidence nor was it the fruit of wiretap evidence. The objections of

defendant to the evidence which was received and considered by this Court are overruled.

It must be kept in mind that the Government is not seeking to denaturalize Costello because he was a bootlegger, or to impose sanctions on him because he was a bootlegger in 1925. The purpose of the action is to restore the citizenship status quo as it existed prior to September 10, 1925, on the ground that any change in that status was accomplished by defendant by fraud and the concealment of material facts.

Conclusions

The Court concludes:

1. This Court has jurisdiction over the person of the defendant and over the subject matter of this action.

2. This action was properly commenced pursuant to the provisions of § 340(a) of the Immigration and Nationality Act of 1952, as amended 8 U.S.C. § 1451(a).

3. The naturalization of the defendant Costello was induced by the concealment by him of material facts and by fraudulent misrepresentation of facts by him; and if the true facts had been revealed or known defendant's petition for naturalization would have been denied.

4. That the decree of the court, dated September 10, 1925, naturalizing the defendant Costello, and the certificate issued pursuant thereto, was secured as a result of the concealment of material facts, willful misrepresentation and fraud, and that judgment should therefore be vacated, cancelled and set aside by this Court.

Judgment is therefore granted revoking and setting aside the order of this court entered on September 10, 1925, admitting the defendant Frank Costello to citizenship, and cancelling Certificate of Naturalization No. 2136470 issued by this court to the defendant Frank Costello on September 10, 1925.

This opinion constitutes the findings of fact and conclusions of law of the Court.

Let judgment be entered accordingly.